744 A.2d 1255

**Randall A. CHARLES, Appellee,**

v.

**Richard STEHLIK, Appellant.**

Supreme Court of Pennsylvania.

Argued Sept. 14, 1999.

Decided Jan. 19, 2000.

---

Melaine Shannon Rothey, Pittsburgh, for Richard Stehlik.

Karen Hassinger, Washington, for Randall A. Charles.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

CAPPY, Justice.

This is a custody matter. The question at issue is whether the lower courts properly determined that Randall Charles ("Appellee"), who is the step-parent of the child in question, should have primary custody rather than Richard Stehlik ("Appellant"), who is the child's biological father. After careful review of this matter, we affirm.

Appellant and Linda Bauer ("Mother") were married on December 6, 1986. A son, who was named Matthew, was born to Appellant and Mother on March 3, 1989; this was the only child resulting from this marriage. In August of 1989, a few months after Matthew was born, Appellant and Mother separated. At that juncture, Mother moved from the marital residence in New Jersey to reside with her parents in Pittsburgh. Mother took with her Matthew and her two children from her first marriage, Kimberly and Kevin Bauer (referred to as "Kimberly" and "Kevin").

Mother subsequently met Appellee in Pittsburgh and married him on July 21, 1990. Mother and Appellee set up house with their new blended family consisting of the then one year old Matthew, Kimberly, Kevin, and Appellee's daughter, Jennifer. During Mother's marriage to Appellee, Mother had primary physical custody of Matthew. Appellee was very active in Matthew's life; so close was the relationship between the two that Matthew has always called Appellee "daddy".

In November of 1993, Mother was diagnosed with cancer. She ultimately succumbed to this disease, dying on September 4, 1995.

After Mother's death, Kimberly and Kevin moved to Virginia to live with their father without incident. Custody of Matthew, however, became a contested issue. On September 15, 1995, Appellee filed a complaint seeking primary custody of Matthew. This matter was assigned to the Honorable Ronald W. Folino. Extensive evidence was presented by several witnesses, including Appellant, Appellee, Jennifer, a few character witnesses, the therapist who treated Matthew following the death of Mother, and from William F. Fischer, Ph.D. ("Dr.Fischer"), a court-appointed psychologist.

The trial court relied heavily on the testimony of Dr. Fischer, whom the trial court found both credible and persuasive. Tr. ct. slip op. at 6–7. In formulating his opinion in this matter, Dr. Fischer conducted interviews and tests with the parties, Matthew, and Jennifer, Matthew's stepsister. Dr. Fischer also conducted telephone interviews with the therapist who helped Matthew cope with the death of Mother as well as a counselor who had been working with Appellant. After gathering all of this data, Dr. Fischer opined that it was "in Matthew's best interest to remain in the primary custody of [Appellee], at least for the present time." Tr. ct. slip op. at 7.

The trial court summarized the many factors on which Dr. Fischer based this opinion. First, Dr. Fischer pointed to the fact that on two separate occasions, Matthew spontaneously indicated[1] that "he wanted to stay with his dad *here* in Pittsburgh (i.e.[Appellee] )." Tr. ct. slip op. at 7 (emphasis in the original); *see also* tr. ct. slip op. at 9. Dr. Fischer also testified that Matthew was more cheerful and relaxed when he accompanied Appellee to the sessions with Dr. Fischer than when Matthew accompanied Appellant. Tr. ct. slip op. at 7. Also, the pictures that Matthew drew while in the company of Appellant showed chaotic and sad scenes, tr. ct. slip op. at 7–8,

---

1. Dr. Fischer stressed that he never asked Matthew whether he would prefer to reside with Appellant or Appellee as to do so would be "to ask a child to betray one of the parents." N.T., 08/15/1996, at 21.

while the ones he drew in the company of Appellee were "much more cheerful...." N.T., 08/15/1996, at 25. Finally, Dr. Fischer testified that Matthew's loss of his mother would make it "extremely difficult, if not traumatic, for Matthew to move to New Jersey at this time." Tr. ct. slip op. at 8.

The trial court also relied on the testimony provided by Jennifer LaRosa ("Ms.LaRosa"), the therapist who treated Matthew after Mother's death. Ms. LaRosa testified that Matthew felt a strong sense of abandonment whenever he would visit Appellant in New Jersey, and that he worried that he would not be brought back to Pittsburgh. Tr. ct. slip op. at 11–12.

Appellant and Appellee both testified. As to Appellant, the trial court found that he loves Matthew very much. Although the trial court was concerned about displays of "questionable judgment" and of anger on the part of Appellant, it noted that its "overall impression of [Appellant] ... was that he is a good man and truly wants to be a loving (and loved) father." Tr. ct. slip op. at 14–15. The trial court, however, expressed concerns over Appellant's "capacity to withdraw and isolate himself from others," a trait which was clearly not in Matthew's best interests. Tr. ct. slip op. at 15.

The trial court found that Matthew's life centers on his home in Pittsburgh. The trial court referred to Appellee, who has lived with Matthew since Matthew was a year old, as Matthew's "day-to-day father". Tr. ct. slip op. at 4. The trial court found Appellee credible when he testified "that Matthew calls him dad or daddy[, and that Appellee] ... treats Matthew like his son...." Tr. ct. slip op. at 9. The trial court further noted that Pittsburgh is the only home that Matthew had ever known in his eight years of life. The court stated that "Matthew's school is here, his stepsister (Jennifer) is here, his maternal grandparents are here and his school friends are here." Tr. ct. slip op. at 9–10.

The trial court, therefore, concluded that as "Matthew has had such serious and traumatic changes and losses in his life recently, it would not be healthy for him to suffer the addition-

al loss of his day-to-day home and father and be required to move to a new home in New Jersey." Tr. ct. slip op. at 15–16. The trial court noted that it made this determination by applying the standard which states that a biological parent has a *prima facie* right to custody as against a third party, and that the scales are thus tipped hard in favor of the biological parent at the outset of the analysis.[2] The trial court found that this presumption in favor of the biological parent had been overcome in this matter as "the instant case offers compelling and convincing reasons why [Appellee] should ... retain primary custody of Matthew at the present time." Tr. ct. slip op. at 17. The trial court, however, stressed that "Matthew's relationship with his biological father should continue and should be expanded." Tr. ct. slip op. at 16. The trial court's order thus provided that Appellant would have partial custody of Matthew, and the length of the summertime visits Matthew would spend with Appellant in New Jersey would gradually increase over the next several years.

The Superior Court affirmed on appeal. It determined that the trial court's conclusion to award primary custody to Appellee was supported by the record. The court also noted with approval the trial court's decision to order increasing visitation between Matthew and Appellant as it would be in the best interests of the child to maintain and strengthen his relationship with his biological father.

Appellant then filed a petition for allowance of appeal with this court and we granted allocatur.

■ In reviewing custody matters, this court has stated that our scope of review "is very broad. Nonetheless, a broad scope of review should not be construed as providing the reviewing tribunal with a license to nullify the factfinding functions of the court of the first instance." *Albright v. Commonwealth, ex rel. Fetters*, 491 Pa. 320, 421 A.2d 157, 158–59 (1980) (citations omitted). We have stated that an

2. Although the trial court did not cite to a specific case in support of applying this standard, it was clearly referring to this court's decision in *Ellerbe v. Hooks*, 490 Pa. 363, 416 A.2d 512 (1980). *Ellerbe* will be discussed at length *infra*.

appellate court may not reverse a trial court's custody order absent a showing that the trial court abused its discretion. *See Robinson v. Robinson,* 538 Pa. 52, 645 A.2d 836 (1994).

It is axiomatic that in custody disputes, "the fundamental issue is the best interest of the child." *Ellerbe v. Hooks,* 490 Pa. 363, 416 A.2d 512, 513 (1980). In a custody contest between two biological parents, "the burden of proof is shared equally by the contestants...." *Id.* Yet, where the custody dispute is between a biological parent and a third party, the burden of proof is not evenly balanced. In such instances, "the parents have a 'prima facie right to custody,' which will be forfeited only if 'convincing reasons' appear that the child's best interest will be served by an award to the third party. Thus, even before the proceedings start, the evidentiary scale is tipped, and tipped hard, to the [biological] parents' side." *Id.* at 514 (quoting *In re Hernandez,* 249 Pa.Super. 274, 376 A.2d 648, 654 (1977)).[3]

In the matter *sub judice,* the trial court properly noted that "the evidentiary scales were tipped hard in [Appellant's] favor." Tr. ct. slip op. at 17. Yet, even with Appellant having this presumption in his favor, the trial court nonetheless found that there were convincing reasons which compelled it to award primary custody of Matthew to Appellee. As noted *supra,* the trial court gave extensive reasons to support this conclusion. The most important factors to the trial court were that Matthew felt most at home in Pittsburgh with Appellee, the man he has known as "dad or daddy," tr. ct. slip op. at 9, since he was a baby. Furthermore, the trial court noted that considering the recent loss of his mother and his half-siblings, uprooting Matthew from his home, school, and the man he

---

**3.** A few years ago, a plurality of this court indicated that it desired to "abandon the presumption that a parent has a prima facie right to custody against third parties...." *Rowles v. Rowles,* 542 Pa. 443, 668 A.2d 126, 128 (1995). Instead, the plurality favored the adoption of a standard which would "eliminat[e] the presumption per se, and mandat[e] that custody be determined by a preponderance of the evidence, weighing parenthood as a strong factor for consideration...." *Id.* (citations omitted). This position did not, however, garner a vote of the majority of the court.

considers his "dad" could prove devastating to Matthew's present mental condition. In light of the circumstances of this case, we find that the trial court did not abuse its discretion when it ordered Matthew to remain in the custody of Appellee.

Appellant takes issue with the trial court's determination. He first contends that the trial court's decision is not supported by sufficient evidence because the trial court based its determination solely on the testimony of Dr. Fischer, a witness who had little opportunity to observe the parties. This claim must fail. First, although the trial court did rely heavily on the testimony of Dr. Fischer, such testimony was certainly not the only basis for the trial court's opinion. The trial court based its opinion on the testimony of several witnesses, including Appellant, Appellee, Jennifer, Ms. LaRosa, and many character witnesses.

Also, the record does not bear out Appellant's claim that Dr. Fischer's contact with the parties was so minimal that he could not form an opinion in this matter. Dr. Fischer conducted a series of interviews with the parties in the winter of 1995–1996; he also conducted telephone interviews with Ms. LaRosa as well as a counselor who had been working with Appellant. In addition, Dr. Fischer conducted another series of interviews in December 1996–January 1997. We cannot agree with Appellant that Dr. Fischer's knowledge of the dispute at issue was so shallow that the trial court erred in crediting his testimony.

Next, Appellant argues that Appellee should have been required not only to prove that there were convincing reasons as to why Matthew should remain with Appellee, but also that Appellant was an unfit parent. In support of his position, Appellant notes that several of our sister states have adopted the standard whereby a biological parent will always prevail over a third party in a custody dispute unless there has been an affirmative showing that the biological parent is unfit or has abandoned the child. *See, e.g., Terry v. Sweat,* 494 So.2d 628 (Ala.1986); *Schuh v. Roberson,* 302 Ark. 305, 788 S.W.2d 740 (1990); *Petersen v. Rogers,* 337 N.C. 397, 445 S.E.2d 901 (1994); *Barstad v. Frazier,* 118 Wis.2d 549, 348 N.W.2d 479

(1984). He claims that if this court were to adopt such a standard, we would have to reverse the trial court for not only did Appellee fail to establish that Appellant was an unfit parent, but Appellant also presented extensive evidence showing his fitness to have custody of Matthew.

We agree with Appellant that some of our sister states do employ such a standard. This court, however, has explicitly declined to follow such a path. In *Albright v. Commonwealth. ex rel. Fetters*, 491 Pa. 320, 421 A.2d 157, 161 (1980), we stressed that the biological parent's prima facie right to custody

is not to be construed as precluding a custody award to a non-parent, absent a demonstration of the parent's dereliction. We again emphasize that the standard seeks only to stress the importance of parenthood as a factor in determining the best interests of the child. However, other factors which have significant impact on the well being of the child can justify a finding in favor of the non-parent, even though the parent has not been shown to have been unfit.

■ We see no reason to abandon our *Albright* holding. As noted *supra*, "the cardinal concern in all custody cases is the best interest and permanent welfare of the child." *Id.* at 158. In staying true to that maxim, we have decreed that there will be instances where it is proper to award custody to the third party even where there has been no showing that the biological parent is unfit. While this Commonwealth places great importance on biological ties, it does not do so to the extent that the biological parent's right to custody will trump the best interests of the child. In all custody matters, our primary concern is, and must continue to be, the well-being of the most fragile human participant—that of the minor child. We therefore reject Appellant's argument.

For the foregoing reasons, the order of the Superior Court is affirmed.

Chief Justice FLAHERTY files a concurring opinion.

Justice NIGRO files a dissenting opinion.

FLAHERTY, Chief Justice, concurring.

I concur in the affirmance of the award of custody to appellee, but write separately to express that I favor the approach to custody determinations set forth in my concurring opinion in *Ellerbe v. Hooks*, 490 Pa. 363, 371–74, 416 A.2d 512, 515–17 (1980), which was followed by a plurality of this court in *Rowles v. Rowles*, 542 Pa. 443, 668 A.2d 126 (1995). That approach discards the presumption that a parent has a prima facie right to custody against third parties and substitutes a standard requiring that custody be determined by a preponderance of the evidence, weighing parenthood as a strong factor for consideration. *Id.* at 447, 668 A.2d at 128.

NIGRO, Justice, dissenting.

I respectfully dissent, as I believe that the standard set by the cases from our sister jurisdictions is the one we should follow. The supreme courts of North Carolina, Iowa, Arkansas, Alabama and Wisconsin have all upheld a presumption in favor of granting custody to a natural parent as against a third party which shall only be overcome by showing that the natural parent is unfit or unable to assume parental responsibilities.[1]

When two natural parents each seek custody of their child pursuant to a separation or divorce, the courts are forced to choose and therefore "best interests of the child" is the proper standard. Thus, absent true joint custody, one parent will prevail over the other—even if by the slimmest of margins. In a highly mobile society, additionally fraught with the vagaries of modern relationships, those initial custody decisions may have a long-term effect of severing the child/non-custodial-parent ties equivalent to terminating that parent's parental rights. "The day to day contact between the child and one having custody can create a relationship that may leave the

1. *See Petersen v. Rogers*, 337 N.C. 397, 445 S.E.2d 901 (1994); *In re Marriage of Halvorsen*, 521 N.W.2d 725 (Iowa 1994); *Schuh v. Roberson*, 302 Ark. 305, 788 S.W.2d 740 (1990); *Terry v. Sweat*, 494 So.2d 628 (Ala.1986); *Barstad v. Frazier*, 118 Wis.2d 549, 348 N.W.2d 479 (1984).

birth parent almost an intruder. All of the day to day interactions between a parent and child are bound to be diminished if not eliminated where the parent comes on the scene as a court permitted 'visitor'." *Barstad v. Frazier*, 118 Wis.2d 549, 348 N.W.2d 479, 483 (1984).

I believe, as does the Supreme Court of Alabama, that

[t]he prima facie right of a natural parent to the custody of his or her child, as against the right of custody of a nonparent, is grounded in the common law concept that the primary parental right of custody *is in the best interest and welfare of the child as a matter of law.* So strong is this presumption, absent a showing of voluntary forfeiture of that right, that it can be overcome only by a finding, supported by competent evidence, that the parent seeking custody is guilty of such misconduct or neglect to a degree which renders that parent an unfit and improper person to be entrusted with the care and upbringing of the child in question.

*Terry v. Sweat*, 494 So.2d 628 (Ala.1986) (quoting *Hanlon v. Mooney*, 407 So.2d 559 (Ala.1981)) (emphasis added).

Furthermore, I believe that natural parents have a constitutionally protected paramount right to custody, care and control of their child whenever there is no evidence that the parents were unfit or neglected the child's welfare. While the United States Supreme Court has not specifically addressed the question of what the Constitution requires in a custody dispute between a parent and a nonparent third party, in other cases in the parental rights arena it has said

[t]he rights to conceive and to raise one's children have been deemed "essential," *Meyer v. Nebraska*, 262 U.S. 390, 399 [43 S.Ct. 625, 626, 67 L.Ed. 1042] (1923), "basic civil rights of man," *Skinner v. Oklahoma*, 316 U.S. 535, 541 [62 S.Ct. 1110, 1113, 86 L.Ed. 1655] (1942) and "[r]ights far more precious ... than property rights," *May v. Anderson*, 345 U.S. 528, 533 [73 S.Ct. 840, 843, 97 L.Ed. 1221] (1953). "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and

freedom include preparation for obligations the state can neither supply nor hinder." *Prince v. Massachusetts*, 321 U.S. 158, 166 [64 S.Ct. 438, 442, 88 L.Ed. 645] (1944). *Petersen v. Rogers*, 337 N.C. 397, 445 S.E.2d 901, 903 (1994).

As the natural parent's rights in this regard are so fundamental, I would abrogate them only rarely and only in the most extraordinary circumstances, as where there is a judicial finding of persistent neglect of parental responsibilities. Therefore, similar to this Court's majority opinion, I would find that as between a natural parent and a third party the presumption of custody is tipped hard in the natural parent's favor. I differ from the majority, however, in that I would find that the presumption can only be overcome by placing on the nonparent third party the considerable burden of establishing the extraordinary circumstance that the natural parent has violated his parental responsibilities or has been determined to be judicially unfit.

In the instant matter, as the third party nonparent failed to establish that the natural father violated his parental responsibilities or was unfit, I would award primary custody to the natural father.