**Roy Steven KING, Appellee,**

v.

**Pamela McConnell KING, Appellant.**

Superior Court of Pennsylvania.

Argued Oct. 6, 2005.

Filed Dec. 16, 2005.

Carol McCarthy, Pittsburgh, for appellant.

Cathy S. Boyer, Butler, for appellee.

Before: HUDOCK, PANELLA and TAMILIA, JJ.

OPINION BY TAMILIA, J.:

¶ 1 Pamela McConnell King appeals the January 4, 2005 Order granting primary physical custody of the parties' then 12–year–old daughter Paige, to appellee, Roy Steven King. After careful consideration, we affirm.

¶ 2 The parties were married in 1990, and Paige was born in 1992. They separated in 1996, divorced in 1998, and after a full custody hearing the court awarded father primary physical custody by Order entered August 24, 2000. Mother appealed, but the Order was affirmed on May 7, 2001. *King v. King*, 778 A.2d 1254 (Pa.Super.2001) (unpublished memorandum).

¶ 3 On August 27, 2002, mother filed a petition for modification of custody, and father and his wife submitted to custody evaluations as ordered on December 2, 2002. Mother refused to comply, however. On June 1, 2003, having alleged father had slapped Paige while holding a steak knife, mother obtained a temporary protection from abuse Order from the Court of Common Pleas of Erie County granting her temporary custody of the child, with no contact for father. Mother merely picked the child up after school one day in June 2003, and father did not see the child again for seven months, until January 2004. Rather than contest the PFA Order, father agreed to it with the understanding that to do so would expedite the custody proceedings and would supersede the PFA Order.[1] When it became apparent the custody dispute would not readily be resolved, and mother took Paige and moved from Butler to Lawrence County, four miles across the county line, father petitioned for and was awarded special relief in the form of supervised visitation with Paige. Mother ignored the September 10, 2003, Order, however, as well as the previously mentioned directive that she submit to a custody evaluation. Father filed a petition for contempt, and on July 18, 2003, mother filed a second custody action in Lawrence County which ultimately was dismissed by Order entered October 24, 2003, wherein the court opined mother's Lawrence County residence was a "sham established as a basis to attempt to remove the action that

---

1. "Father did not anticipate that a full custody trial would not occur for 16 months after the filing of the PFA by Mother." Trial Court Opinion, Hancher, J., 1/4/05, at 4.

she had commenced in Butler County." On January 13, 2004, after much legal wrangling, a consent Order was entered stating that mother would retain temporary custody of the child, with father having partial custody, pending the outcome of the litigation. Custody evaluations of the parties by a different evaluator were ordered and this time completed, with the evaluator opining that custody of Paige should be awarded to appellant. Judge George H. Hancher, the trial judge who had presided over all of the proceedings since 2000, then conducted a two-day hearing and, on January 4, 2005, reinstated primary physical custody with the appellee father. Mother appealed.

¶ 4 Mother argues the trial court erred by ignoring and/or giving no weight either to the recommendation of the evaluator or the preference of the child, Paige. Appellant also argues the court erred by failing to give appropriate weight to the importance of maintaining the *status quo*.

■■■ ¶ 5 This Court's scope of review in custody cases consistently has been defined by our Supreme Court as very broad. *Charles v. Stehlik*, 560 Pa. 334, 744 A.2d 1255, 1257 (2000), *cert. denied*, 530 U.S. 1243, 120 S.Ct. 2689, 147 L.Ed.2d 961 (2000). "Nonetheless a broad scope of review should not be construed as providing the reviewing panel with a license to nullify the fact-finding functions of the court of first instance." *Id.* (quoting *Albright v. Commonwealth ex rel Fetters*, 491 Pa. 320, 421 A.2d 157, 158–159 (1980)). As an appellate Court, we "are empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but may not interfere with those conclusions unless they are unreasonable in view of the trial court's findings, and, thus, represent a gross abuse of discretion." *McMillen v. McMillen*, 529 Pa. 198, 602 A.2d 845, 847 (1992) (citations

omitted); *see also T.B. v. L.R.M*, 567 Pa. 222, 786 A.2d 913 (2001). "Custody decisions are to be made on the basis of the child's best interests." *Charles, supra*, at 1258 (citation omitted).

> [W]hen expert evaluation is uncontradicted or unqualified, a child custody court abuses its fact finding discretion if it totally discounts expert evaluation. To say that a court cannot discount uncontradicted evidence, however, is merely to rephrase the requirement that a child custody court's conclusion have competent evidence to support it. So long as the trial court's conclusions are founded in the record, the lower court [is] not obligated to accept the conclusions of the experts.

*Nomland v. Nomland*, 813 A.2d 850, 854 (Pa.Super.2002) (citations and a quotation omitted). It is not this Court's function to determine whether the trial court reached the "right" decision; rather, we must consider whether, "based on the evidence presented, given due deference to the trial court's weight and credibility determinations," the trial court erred or abused its discretion in awarding custody to the prevailing party. *Hanson v. Hanson*, 878 A.2d 127, 129 (Pa.Super.2005).

■■■ ¶ 6 As stated above, Judge Hancher has presided over all of the court proceedings since the year 2000, when the issue of custody was first challenged by husband after wife, with whom daughter had resided since the 1996 separation, whimsically absconded to Michigan for six to eight weeks. At that time, the court heard testimony for two days, after which it concluded that the marriage was "chaotic"; father, who lived with his girlfriend, had abused alcohol during the marriage but apparently not since the parties' separation, and mother, who broke up with her abusive boyfriend immediately prior to trial, had a 32–year history of involving her-

self with men who abused her as well as alcohol. As a consequence, the court awarded custody of Paige to her father. "[Paige] needs removal from a chaotic lifestyle for a chance to be not "at risk" in her early adolescence. Father's residence and durable relationship with [girlfriend] is more likely to provide that necessary, stable environment for Paige than that of her mother." Trial Court Opinion, Hancher, J., 8/24/00, at 15. Father has since married his girlfriend and they have two children together.

¶ 7 Now four years and several petitions later, Judge Hancher is again faced with a custody decision. During the two-day hearing, conducted September 29 and 30, 2004, the court heard testimony from the parties, Paige and one of her teachers, mother's thirty-six-year-old son Timothy, father's wife, a few friends and relatives, and the custody evaluator, Dr. William Bush, a different evaluator than was assigned during the first custody proceedings. Appellant does not challenge husband's ability to parent Paige, but only questions whether the court erred by not giving proper weight to the testimony of Paige, Dr. Bush, and the *status quo*. For that reason, we primarily will limit our review to the testimony of those individuals and that issue, limiting our consideration to determining whether the court's decision is supported by the evidence.

¶ 8 Twelve-year-old Paige, then a seventh-grader, testified favorably about her school, her friends, and her relationships with her mother, her brother Timothy and his 13–year–old daughter, Tiffany. Paige testified that she is very close with her mother, with whom, at the time, she had lived for 15 months. She did not express similar sentiments with regard to her father and step mother. N.T., 9/29/04 at 17–18. Paige, however, did testify that things were going well for her during visits with her father, explaining that on a prior occasion, 18 months earlier, she had been slapped by her step mother, and was happy when temporary custody was awarded to mother. *Id.* at 19–20. Paige rated her relationship with her stepmother at a two or three on a scale of one to ten, and told the court she nicknamed her step mother the "step monster." *Id.* at 21. On that same scale, Paige rated her desire to remain with her mother a "ten", explaining that she loves her mother, they have a good relationship, and they enjoy doing things together. If she had to move back with her father, Paige stated she would be minimally upset, a "two" on the scale used.[2] *Id.* at 24. She was hesitant to say too many nice things about living with her father for fear the court would make her return to his custody. *Id.* at 46. Paige testified she loves each of her parents and their families equally.

¶ 9 Dr. Bush testified that he met with the parents, the step mother, and the child, each two times during the evaluation procedure. During these interactions he evaluated the individuals' personalities, the parents'[3] attitudes and their abilities to adapt and resolve issues, and also observed their interactions with the child.[4]

---

2. When the scale of one to 10 was explained to Paige by mother's counsel, Paige initially graded being told to live primarily with her dad as a "one." When questioned further, Paige replied "zero." When counsel yet again attempted to explain the scale and asked Paige for a rating, she settled on "two."

3. The word "parents" as used herein references the birth parents as well as appellee's wife, the child's step mother.

4. The tests employed by the doctor to evaluate the adults included the Sixteen Personality Factor Questionnaire, the Family Adaptability and Cohesion Evaluation Skills, and the Adult Adolescent Parenting Inventory.

The doctor opined that mother and daughter were every close, repeating on a couple occasions that he believed they were "joined at the hip." He assessed mother's personality as occasionally "calculating and manipulative rather than genuine and forthright," and that she could sometimes impress others as being narcissistic and self centered. N.T., 9/30/04 at 33–34. Mother and daughter were very demonstrative in their interactions. *Id.* at 39. As for appellee, the doctor noted his prior problems with alcohol, and indicated that this current marriage, in 2000, was his third. *Id.* at 40–42. Unlike mother, father presented as being impatient, shy, and sensitive to criticism, and perhaps unaware of the emotional toll the custody battle was having on Paige. While father's household is stable, father is slightly at risk for the use of corporal punishment. *Id.* at 46–47. According to the doctor, father is very "satisfied" with his relationship with Paige. *Id.* at 48. Dr. Bush found the step mother to be very positive and proactive in her dealings with Paige, and was realistic concerning the overall success of their family life. *Id.* at 64–65.

¶ 10 Doctor Bush then offered his opinion with regard to Paige. He opined that the child was more demonstrative when she was with her mother, and more emotionless when with her father. *Id.* at 50–51. There was an emotional distance between Paige and her father and step mother, and the other extreme when with her mother. *Id.* at 51. Dr. Bush performed an additional test on Paige, the Child Custody Scaling Index, designed to assess, on a scale of one to ten, her perception of her parents' happiness, their modes of discipline, etc. She assessed her mother as a ten and her father a one, finding her mother less of a disciplinarian, less demanding, and more trustworthy. *Id.* at 52. Paige found her father more demanding of her and of her respect, and she feared recrimination from him more for any misbehavior. Paige's number one wish was to be allowed to live with her mother. *Id.* at 55. The child was "highly dissatisfied" with her relationships with father and stepmother, and "highly satisfied" with her relationship with her mother. *Id.* at 58. Dr. Bush found no intentional alienation on the part of either parent. *Id.* at 62.

¶ 11 Both parents testified unremarkably. Mother testified with regard to her home that she purchased in April, 2004, the daycare provided when necessary, and her seasonal job with a road crew that allows her to be at home with Paige full-time between the months of November and April. She also explained her acrimonious relationship with the step mother and her difficulty in communicating with the appellee concerning their daughter.

¶ 12 Father testified about the four-bedroom home he shares with his wife and their two children, and the home and social life Paige enjoys when she visits them. While he and his wife both have fulltime jobs, there is a YMCA daycare located one quarter of a mile from their home. Father explained that step mother never has slapped Paige, that she disciplined her only by escalating voice. He added that Paige, like most children her age, was less than cooperative when told to do chores such as clean her room. Father testified that he wanted his daughter to return to living with him, her stepmother and two siblings, where her life would be more stable and routine. His concerns are that Paige's relationship with her mother is more like a friendship, and that at this stage of her life Paige needs discipline and stability. Both parties discussed the alleged slapping incident, purportedly the result of discipline for back talking, which led to the 2003 PFA and the seven month separation of father and daughter. Father, like mother, expressed doubts that

they could effectively share responsibilities and communications concerning Paige.

¶ 13 Prior to making his decision suggesting that custody remain with appellant/mother, Dr. Bush reviewed the report of the custody evaluator made in 2000, as well as the trial court's findings from that proceeding. He found that mother had matured emotionally, and that Paige was not genetically predisposed to assume any particular negative characteristic. *Id.* at 95. "Paige is a pretty bright little girl." *Id.* Based on his review of the record and the evidence presented, it was Dr. Bush's professional opinion that Paige's best interest would be served by awarding mother primary physical custody of Paige, with father enjoying liberal partial custody. *Id.* at 67, 99. He also suggested therapy for the parents to enable them to deal with each other without the help/interference of the step mother. He opined that if Paige was forced to return to her father's custody, the situation would be exacerbated, the negative feelings between the parents would continue, and that Paige would be the victim.

¶ 14 The trial judge in this matter, sitting as the ultimate of finder of fact, was in the unique position of having had the opportunity to observe all of the parties in this matter for a period of at least four years. He heard the extensive testimony of all concerned in 2000, and ruled that

Paige's best interests would be served by living with appellee. Now, four years later, the court again heard extensive testimony of and for all concerned and, despite the evaluator's opinion and Paige's expressed wishes, has ruled once more that it is in Paige's best interests to return to her father, to the home in which she lived in contentment for three years before appellant removed her surreptitiously and kept her whereabouts unknown for several months. Despite mother's somewhat improved maturity level, as found by the evaluator, the trial judge court still heard testimony and observed behavior which convinced him that the stable, disciplined environment of father was a better nurturing environment than that provided by mother who, in the court's eyes, relished and embraced the role of Paige's friend, shunning that of parent, and disregarding the emotional toll this protracted litigation had on Paige.[5] At this critical stage of now, thirteen-year-old, Paige's life, despite what her adolescent feelings tell her, she needs strong guidance and a stable home environment, a place where she feels secure and grounded, where daily routines are just that, routine. Our review of the facts before us reveals a situation in which both parents clearly love their daughter and want her to be happy. And while no specific fact stands out as being dispositive in the court's decision to award custody to

---

**5.** In its supplemental Opinion the court addressed mother's self-serving behavior.

[W]e find it hard to believe Mother did not recognize that the constant turmoil of litigation had an adverse effect upon Paige. Mother made the decision to file a complaint in Butler County, but then spent approximately the next two years intensifying and dragging out the litigation, keeping the case from final resolution. She refused to meet with court-appointed psychologist Dr. Koffman. Mother then moved her residence to Lawrence County, while the case was still pending here. Subsequent to filing in Butler County, Mother filed in Lawrence County and then moved to transfer venue to Lawrence County.... Mother did not oblige with the court-ordered visitation between Paige and Father. Taking into account the traits of "calculating and manipulative" attributed to Mother by Dr. Bush and that Mother "presented as an individual who would work very steadily toward long range goals," we cannot believe that during the prolonged litigation Mother was acting in the best interests of her child. Supplemental Trial Court Opinion, Hancher, J., 4/1/05 at 2–3.

father and not mother, the fact remains that the court had the opportunity to hear all interested witnesses and make credibility determinations. In a comprehensive review of the evidence and testimony of the parties, school teachers, relatives and the custody evaluator, Dr. Bush, Judge Hancher detailed 96 findings of fact with an excellent analysis and interpretation of the nuances expressed by the witnesses which strongly support his conclusions. Our standard of review does not allow us to alter the court's conclusions provided they are supported by the record or unless they are manifestly unreasonable. The court's decision awarding custody to appellee is supported by the voluminous record before us.

¶ 15 Order affirmed.