J-A26035-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| J.S., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| J.C., | |
| Appellee | No. 710 MDA 2014 |

Appeal from the Order entered April 3, 2014,
in the Court of Common Pleas of Huntingdon County,
Civil Division, at No(s): 2006-0398

BEFORE:  BOWES, MUNDY, and JENKINS, JJ.

MEMORANDUM BY JENKINS, J.:                    **FILED FEBRUARY 02, 2015**

J.S. ("Father") appeals from the order of the Court of Common Pleas of Huntingdon County, entered April 3, 2014, that denied Father's Petition to Modify Custody and granted J.C. ("Stepfather") primary physical custody of the male child, T.H., born in July of 2002 ("Child"), during the school year, and granted Father partial physical custody three weekends each month from Friday at 6:00 P.M. until Sunday at 6:00 P.M.  The trial court also ordered that, during the summer months, Stepfather and Father shall alternate weeks of custody.  We affirm.

In 2006, Father and A.C., Child's biological mother ("Mother"), entered into a custody stipulation that resulted in the parents sharing legal and physical custody of Child.  Mother passed away in September of 2012.  On October 29, 2012, Stepfather filed a Praecipe to Amend Caption and

substituted himself for Mother as a party to the case. Father signed a new Custody Stipulation under which physical custody of Child was shared between Stepfather and Father. Stepfather was given primary physical custody during the school year, and Father was given liberal periods of partial custody on weekends. In addition, on October 29, 2012, Stepfather and Father entered into a Custody Stipulation providing shared legal custody.

On October 21, 2013, Father filed a Petition to Modify Custody, seeking sole legal custody and primary physical custody of Child subject to Stepfather's periods of partial physical custody.

The trial court conducted a custody hearing on January 29, 2014. At the hearing, Child, Stepfather, and Father testified. Their testimony established the following facts.

At the time of the custody hearing, Child was eleven years old and in the fifth grade at Spring Farms Elementary School in Three Springs, Pennsylvania. N.T. 1/29/2014, pp. 6-7. Child resides at 21630 Shore Valley Road in Three Springs with Stepfather, Stepfather's fiancée, his half-brother, Alexander (age six), his half-sister, Emma (age two), and Stepfather's fiancée's son, Michael (age 11) (collectively, "siblings"). N.T. 1/29/2014, pp. 6-7, 18-19. Child participates in normal family/child activities with the siblings, Stepfather, and Stepfather's fiancée, and has good relationships with all. N.T. 1/29/2014, pp. 8-11, 33, 64-65.

Stepfather met Mother at a wedding nearly ten years before the custody hearing. N.T. 1/29/2014, p. 21. Stepfather was living in Mississippi at the time, but relocated to Pennsylvania soon after the wedding and moved into an apartment in Three Springs with Mother and Child, who was then two years old. N.T. 1/29/2014, p. 21. In 2007, Stepfather and Mother together built the house in which Child, Stepfather, Stepfather's fiancée, and Child's siblings now reside. N.T. 1/29/2014, pp. 18-19.

Stepfather identifies Child as his son, and has at all times performed the duties and responsibilities of a biological parent with respect to Child. N.T. 1/29/2014, pp. 25, 41-42. He has been Child's primary care giver since Child was two years of age. N.T. 1/29/2014, p. 20. Stepfather takes the lead regarding all Child's medical issues.[1] N.T. 1/29/2014, p. 26. He has made Father aware of Child's medical appointments, but Stepfather takes responsibility for scheduling and getting Child to the majority of the appointments. N.T. 1/29/2014, pp. 26-28. Stepfather orchestrates Child's counseling. N.T. 1/29/2014, 37-38. Stepfather and Stepfather's fiancée also monitor and help with Child's progress in school. N.T. 1/29/2014, p. 29, 36, 39. When Stepfather is away or working,[2] Stepfather's fiancée cares for Child. N.T. 1/29/2014, pp. 39-40, 44.

---

[1] Child's medical conditions include vision problems and a genetic condition that requires ongoing monitoring. N.T. 1/29/2014, p. 26.

[2] Stepfather is a construction worker whose work schedule varies depending on work assignments from his union. N.T. 1/29/2014, pp. 33-34, 42-44. As a result, he sometimes experiences periods where he must be away from the

Stepfather testified that, when he first moved to Pennsylvania, Child had only sporadic contact with Father. N.T. 1/29/2014, p. 22. Father's contact with Child increased gradually over the years, despite resistance from Child some five or six years ago. N.T. 1/29/2014, p. 22. Stepfather explained that, at that time, Child would act out, scream, and cry because he did not want to spend time with Father. N.T. 1/29/2014, at 23. Father, in turn, had difficulty spending time with Child during this period, and would occasionally return child from his visits out of frustration. N.T. 1/29/2014, at 23. However, Stepfather and Stepfather's fiancée sought counseling for Child's anger management issues, and Child improved. N.T. 1/29/2014, at 23.

Stepfather further testified that, prior to Mother's death, Father provided money for Child sporadically, but did not pay child support until Child entered kindergarten. N.T. 1/29/2014, p. 25. He has not contributed child support since Mother's death. N.T. 1/29/2014, p. 25. Stepfather, in turn, has not requested child support from Father. N.T. 1/29/2014, p. 25.

Stepfather always encouraged Child to have a relationship with Father. N.T. 1/29/2014, at 22. For his part, Stepfather gets along with Father and has never denied Father the opportunity to be a part of Child's life. N.T. 1/29/2014, at 24. The two have worked together to allow Father to have meaningful contact with Child, even during the contentious period

---

home or long periods not working, especially during the winter months. N.T. 1/29/2014, pp. 33-34, 42-44.

surrounding the present court proceedings.  N.T. 1/29/2014, at 24.  Prior to the court's order, they had worked out a schedule whereby Father had Child every Wednesday afternoon and every weekend.[3]  N.T. 1/29/2014, at 24.

Father lives with his fiancée in Hudstontown, Pennsylvania, 20 minutes away from Child and in a different school district.  N.T. 1/29/2014, pp. 40, 55.  He testified that the triggering event that led to the present litigation was Child's desire to live with him.  N.T. 1/29/2014, p. 57.  He did not present any other reason for his request for modification of Child's custody.

Father disagreed with Stepfather's characterization of his contact with Child during Child's younger years as "sporadic", but he acknowledged that there were periods of time where he did not see Child or pay child support. N.T. 1/29/2014, pp. 55-56.  Father further acknowledged that he stopped paying child support following Mother's funeral.  N.T. 1/29/2014, p. 77. Father testified that he and Stepfather have had no disagreements with regard to either educational or medical decisions.  N.T. 1/29/2014, p. 51. Father explained that his employment[4] prevents him from taking Child to more of his medical appointments.[5]  N.T. 1/29/2014, p. 59.  Father further

---

[3] Father only had Wednesdays and every other weekend with Child prior to Mother's passing.  N.T. 1/29/2014, at 24.

[4] Father works from 6:30 a.m. to 3:30 p.m. for JLG Industries in McConnellsburg, Pennsylvania, where he has worked for fifteen years.  N.T. 1/29/2014, p. 61.

[5] On cross-examination, Father was unable to identify Child's dermatologist, dentist, or vision therapist.  N.T. 1/29/2013, p. 71.

acknowledged that Stepfather plays an important role in Child's life.  N.T. 1/29/2013, pp. 70-71.

Father additionally explained that, during the past year, he and his fiancée have been attempting to locate a suitable house within Child's school district, although he stated such a move would be subject to being close to his fiancée's grandmother, who suffers from Alzheimer's disease.  N.T. 1/29/2013, p. 63.

Father testified that he intends to arrange to keep Child in his present school district by having Child's maternal grandparents get Child on and off the bus in the morning and afternoon at the grandparents' home, which is next door to Stepfather's home.  N.T. 1/29/2013, pp. 62-63.  Father also noted that the plan would involve his fiancée driving Child to his maternal grandparents' home around 7:00 a.m.  N.T. 1/29/2013, p. 74.  In the event that the weather is bad, Child would spend the night with his grandparents.  N.T. 1/29/2013, p. 74.  Father testified that the proposed arrangement would also involve the payment of $6,500.00 in tuition, since Father does not reside in Child's current school district.  N.T. 1/29/2013, p. 75.

Child testified that he enjoys spending time with Father and has a good relationship with Father's fiancée.  N.T. 1/29/2014, p. 10.  Child indicated that his preference would be to live with Father and visit with Stepfather.  N.T. 1/29/2014, p. 12.  Child was unaware of whether such a move would result in him having to change schools, but he believes Father is

looking for a home in Child's current school district.  N.T. 1/29/2014, p. 12-13.

On April 3, 2014, the trial court issued an Order and Memorandum denying Father's Petition to Modify Custody of Child, and granting Stepfather primary physical custody of Child during the school year, and Father partial physical custody on weekends.  The trial court also ordered that, during the summer months, Stepfather and Father shall alternate weeks of custody of Child.

Father filed a timely notice of appeal on April 25, 2014.  Father also filed a Concise Statement of Errors Complained of on Appeal pursuant to Pa.R.A.P. 1925(a)(i) and (b) on April 25, 2014.  On May 23, 2014, the trial court issued an Opinion pursuant to Pa.R.A.P. 1925(a) that adopted its April 3, 2014 Memorandum as the court's discussion of Father's claims.

On appeal, Father raises the following two claims for our review:

> [I.] The trial court failed to apply the correct legal standard for determining custody between a parent and a non-parent[.]
>
> [II.] The trial court's legal conclusions regarding several custody factors are not supported by the factual record[.]

Father's Brief, pp. 9, 13 (all capitals removed).

The custody hearing in this matter was held in January of 2014, and therefore the new Child Custody Act ("the Act")[6] is applicable.  **See C.R.F. v.**

---

[6] 23 Pa.C.S. § 5321 *et seq.*

-7-

J-A26035-14

***S.E.F.***, 45 A.3d 441, 445 (Pa.Super.2012) (holding that, if the custody

evidentiary proceeding commences on or after the effective date of the new

Child Custody Act, January 24, 2011, the provisions of the Act apply).

Our standard of review in custody cases is as follows:

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

***C.R.F.***, 45 A.3d at 443 (citation omitted).

We have stated:

> [t]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

***Ketterer v. Seifert***, 902 A.2d 533, 540 (Pa.Super.2006) (*quoting **Jackson*** 

***v. Beck***, 858 A.2d 1250, 1254 (Pa.Super.2004)).

In discussing the abuse-of-discretion standard, our Supreme Court has

advised:

-8-

As we discussed in [*In re:*] *R.J.T*. [9 A.3d 1179, 1190 (2010)], there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing . . . . *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 539 Pa. 161, 650 A.2d 1064, 1066 (1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826–827 (Pa.2012).[7]

With any custody case, the paramount concern is always the best interest of the child. *See* 23 Pa.C.S. §§ 5328, 5338. Section 5338 of the Act provides that, upon petition, a trial court may modify a custody order if it serves the best interests of the child. 23 Pa.C.S. § 5338.

After a careful review of the entire record, including the notes of testimony, the applicable law, and the arguments of the parties, we find no abuse of discretion or error of law on the part of the trial court in the legal standard it applied to this matter. Further, we find that the evidence adequately supports the trial court's conclusions and findings in awarding Stepfather primary physical custody, and Father partial physical custody.

---

[7] Although we recognize that **In re Adoption of S.P.** involved the termination of parental rights as opposed to child custody, we find that the Supreme Court's discussion of the abuse-of-discretion standard remains instructive.

Accordingly, we affirm the order of the trial court on the basis of the Honorable George N. Zanic's thorough April 3, 2014 Memorandum and May 23, 2014 Pa.R.A.P. 1925(a) Opinion.[8]

Order affirmed.


Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/2/2015

---

[8] We direct the parties to attach a copy of that opinion in the event of further proceedings in this matter.

IN THE COURT OF COMMON PLEAS OF HUNTINGDON COUNTY, PENNSYLVANIA
CIVIL DIVISION

███████ J.S.,

        Plaintiff

              VS

███████ J.C.,

        Defendant

: NO. 2006-0398

: PROTHONOTARY/CLERK HUNTINGDON CO., PA

2014 MAY 23 P 2:34

FILED

## MEMORANDUM

On April 24, 2014, ███ *J.S.*, the natural father of ███████ *T.H.*, appealed the Order filed by this Court on April 3, 2014. Said Order granted primary residential custody of the minor child to the child's step-father, ███████ *J.C.*

In his Statement of Matters Complained of on Appeal, Appellant raises the issues as follows:

> "Appellant presents this appeal based upon the Court's abuse of its discretion in concluding that Appellee had rebutted Appellant's statutory presumption of primary physical custody. More specifically:
>
> a. The court's reliance upon Charles v. Stehlik, 744 A2d. 1255 (Pa. 2000) to support its award of primary custody to a step-parent is misplaced and the case is factually dissimilar to this matter and was decided prior to the enactment of the Child Custody Act, 23 Pa.C.S. §§ 5321 -5340.
>
> b. The Court's assessment that Appellee had presented clear and convincing evidence in support of being awarded primary physical custody is not supported by the record or the finding announced by the Court. Inasmuch as the Court found the testimony regarding some of the factors for evaluating custody favored Appellant, the record does not support a conclusion that Appellee satisfied a clear and convincing evidence standard."

In direct response to the specific issue raised by the Appellant questioning this Court's reliance on the case of Charles v. Stehlik, 744 A2d. 1255 (Pa. 2000), we believe the Appellant's assertion is misplaced. While we do acknowledge that Stehlik was decided prior to the enactment of the current Child Custody Act, the case was cited to point out the significant burden of a non-

parent in a custody proceeding, and to stress that in Pennsylvania, unlike other states, the non-parent does not have to establish that the natural parent is unfit to obtain primary custody.

In addressing whether or not step-father has met his evidentiary burden, we will rely on our April 3, 2014 Memorandum filed concurrently with the Order in question. In the Memorandum, we specifically addressed each of the custody factors as they related to the testimony presented. As a result, this Court is of the opinion that the best interests of ████ are met by the Order in question.

As such, the Order of this Court should be affirmed.

BY THE COURT

DATE: May 23, 2014                     George N. Zanic, President Judge

IN THE COURT OF COMMON PLEAS OF HUNTINGDON COUNTY, PENNSYLVANIA
CIVIL DIVISION

███████████ J.S.,

         Plaintiff

      VS               : NO. 2006-0398

███████, J.C.,

        Defendant

## MEMORANDUM

The Court is called upon to determine the custodial rights of ████████ J.S. ████ the natural father of ████████████, born July 17, 2002, and ██████ J.C ████ the young man's stepfather.

This case began in 2006 when Plaintiff filed a Complaint for shared custody against the natural mother, ████████ A.C. The parents entered into a custody agreement pursuant to a stipulation on May 22, 2006. Sadly, █████ A.C. █████ passed away on September 29, 2012.

On October 29, 2012 a Praecipe to Amend Caption was filed which A.M.H.(C.) substituted ████████ J.C. as the Defendant in this case, replacing ██████ ██████████.

Also on October 29, 2012, Plaintiff and Defendant entered into a stipulation providing that the parties would share legal custody of █████ and that the stepfather would be the residential custodian of █████ subject to periods of partial custody for the natural father. This stipulation was adopted as an Order of Court.

On October 21, 2013 father filed the instant petition to modify custody requesting that he be awarded sole legal custody and primary physical custody of █████ subject to the right of Defendant to have periods of partial custody. A custody conference was held on November 25, 2013, at which time the case was listed for full hearing. That custody hearing was held on January 29, 2014.

We begin by pointing out that the parties do not present on equal footing. In this regard, even though a stipulation was signed by father and this Court entered an Order in October of 2012 giving stepfather residential custody of ████, the natural parent is nonetheless entitled to a prima facie right of custody. See, Jordan v. Jackson, 876 A.2d 443 (Pa. Super 2005).

Likewise, "in any action regarding the custody of the child between a parent of the child and a nonparent, there shall be a presumption that custody shall be awarded to the parent. The presumption in favor of the parent may be rebutted by clear and convincing evidence." 23 Pa.C.S.A. § 5327(b). "The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing so as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." In re B.C., 36 A.3d 601, 605–606 (Pa.Super.2012).

In fulfilment of the statutory requirements and the guidance from our appellate courts, this Court has received evidence relevant to the child's best interest, and must decide whether the evidence presented on behalf of stepfather is weighty enough to bring the scale up to even, and down on his side. See, V.B. v. J.E.B., 2012 PA Super 200, 55 A.3d 1193, 1199 (Pa. Super. Ct. 2012), citing McDonel v. Sohn, 762 A.2d 1101, 1107 (Pa.Super.2000) (quoting Ellerbe v. Hooks, 490 Pa. 363, 416 A.2d 512, 513–514 (1980)).

Initially, we note that the Pennsylvania Supreme Court considered a comparable case involving a custody contest between a stepfather and the natural father following the death of the mother. See Charles v. Stehlik, 560 Pa. 334, 744 A.2d 1255 (2000). The Court affirmed primary custody in the stepfather, stating that unlike other states, in Pennsylvania it was not necessary for a party in loco parentis to establish that the biological parent was unfit before he or she could obtain primary custody. Rather, the Court reaffirmed the standard as follows:

It is axiomatic in custody cases that "the fundamental issue is the best interest of the child." Ellerbe v. Hooks, [490 Pa. 363,] 416 A.2d 512, 513 (Pa.1980). In a custody contest between two biological parents, "the burden of proof is shared equally by the contestants...." Id. Yet, where the custody dispute is between a biological parent and a third party, the burden of proof is not evenly balanced. In such instances, "the parents have a 'prima facie right to custody,' which will be forfeited only if 'convincing reasons'

*appear that the child's best interest will be served by an award to the third party. Thus, even before the proceedings start, the evidentiary scale is tipped, and tipped hard, to the [biological] parents' side." Id. at 514 (quoting In re Hernandez, [249 Pa.Super. 274,] 376 A.2d 648, 654 (Pa.Super.1977))...[W]hile this Commonwealth places great importance on biological ties, it does not do so to the extent that the biological parent's right to custody will trump the best interests of the child.*

744 A.2d at 1257-1259.

In Ellerbe, supra at 514, our Supreme Court held that "these principles do not preclude an award of custody to the nonparent. Rather they simply instruct the hearing judge that the nonparent bears the burden of production and the burden of persuasion and that the nonparent's burden is heavy." The Supreme Court determined that, "where circumstances do not clearly indicate the appropriateness of awarding custody to a nonparent, we believe the less intrusive and hence the proper course is to award custody to the parent or parents." Ellerbe, supra at 514.

As such, our duty in this case is to utilize the factors set forth by legislature in 23 Pa. C.S.A. § 5328 in analyzing the evidence and to thereby determine what is in the best interest of ██████. In this regard, we must weigh the evidence in a manner that affords to the Plaintiff the evidentiary advantage he enjoys as a parent. We will consider each factor individually:

*(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party?*

The testimony is undisputed that the parties have communicated and cooperated since the untimely death of ██████ mother. Stepfather was instrumental in encouraging visits to anger management classes in an effort to enhance the child's relationship with the child's father, prior to mother's passing. Quite compelling was the testimony of stepfather that "(w)e have gotten along. Even over the past year. You know, there has been a little bit of contention here with the court hearings, but before then, even in the last year, very flexible. We have worked with each other. I have never kept him from him when he has asked to go see him. I have never denied it. We have gotten along. We have worked holidays out and everything." (T.T. 24). Stepfather has even arranged to give Father additional visitation since the entry of the Order entered in 2012.

The Court is quite concerned, however, with the nonsensical testimony of father relating to his reasons as to why legal custody should not be shared. (TT 59-61). The statement of father, that "(b)ecause honestly, the doctor that he goes to now might not be the best physician for him. There is always somebody better," (T.T. 60) is curious. Father has shared legal custody of ██████ for seven years, however, he now takes the opportunity to announce that he will do better if given sole legal custody. This Court was not impressed with the second-guessing nature of father's testimony.

Also telling is the tone of father's testimony when he was asked if ██████ was a good kid, and he stated that "Couldn't ask for a better kid. His mother did an exceptional job with him." (T.T. 72.) The Court notes that this was an unnecessary and disdainful jab at stepfather. Stepfather has been the primary caretaker of ██████ since ██████ death, and the obvious negative attitude and lack of appreciation for the stellar job that stepfather has done in raising this young man is a sign of things to come should father become the primary legal and residential custodian.

This Court is convinced beyond any doubt that stepfather has and will continue to encourage and permit frequent and continuing contact between the child and his father, and as such this factor weighs heavily in his favor. The Court is also convinced that should father obtain the control he seeks, the solid influence and guidance of stepfather will be substantially diminished.

(2) *The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.*

No relevant evidence was presented to consider this factor.

(3) *The parental duties performed by each party on behalf of the child.*

Since ██████ mother passed away, stepfather has been the primary caretaker of ██████, and stepfather has ensured that all of ██████ medical needs have been attended to on a daily basis. Stepfather has taken ██████ to the vast majority of his medical appointments. ██████ medical issues are of much greater concern than an average child. Stepfather has easily persuaded the Court that he has excelled as a

primary caretaker and that he would continue to do so in the future.

In contrast, father, was not able to identify ████ dentist, his vision therapist nor his dermatologist. Clearly father is involved with his child and a capable parent, however, he has not participated in the day to day involvement as the primary caretaker which has been successfully undertaken by stepfather. Father has had limited involvement with the ████ teacher this year, but stepfather has taken the lead in the educational aspect of ████ life as well.

**(4) The need for stability and continuity in the child's education, family life and community life.**

This factor weighs very heavily in favor of Defendant. ████ has undoubtedly undergone significant trauma in his life with the loss of his mother. Stepfather has been and will continue to be the stabilizing force in ████ life, and to change residential custody now would be detrimental and certainly not in his best interest.

If this Court were to change residential custody, it is unclear where ████ would go to school. Although everyone agreed that ████ should stay in his present school, there was only speculation as to how to accomplish that task should father become the residential custodian.

Father speculated regarding the paying of tuition to keep ████ in the Southern Huntingdon County School District, and he testified that he was looking for real estate in the Southern Huntingdon County School District. This Court is not persuaded by the testimony of father in that regard, and it is not appropriate to render a decision on what might happen. Stepfather has also indicated a possibility of moving his family home, while staying in the same school district, the stability factor still remains in favor of Plaintiff.

Through his testimony, the Court was able to learn a great deal about stepfather's background and the make-up of the current situation with ████. We learned about the residents of his home, and most importantly we learned about stepfather's fiancée, ████ and her role in assisting with the child-care and assisting ████ with his homework. She has been a positive factor over the course of the past year in the upbringing of ████, and there can be no doubt that she will

continue to be a very positive influence in ████████ life. She is by no means a replacement for his mother, however, the Court cannot ignore her everyday role in assisting with the raising of ████ .

It is quite curious, however, that we only know the name of father's fiancée, █████████ , but know nothing else about her. Granted ████ testified that he gets along with her; however, there was no testimony regarding who she is and the role she might play in ████ life. Obviously, when making a decision as to where a child is going to live, great care has to be undertaken in determining the make-up of each household and whether stability will be provided.

This Court is being asked to speculate regarding the appropriateness of father's household. ████ has done as well as can be expected for a child who has lost his mother. Continued stability is essential, and the stability factor weighs heavily in stepfather's favor.

### (5) The availability of extended family.

Due to the breakdown of the relationship between stepfather and the maternal grandparents, this factor weighs in favor of father. It is clear that Plaintiff has made an effort to include grandparents in ████ life, and there can be no question that the maternal grandparents must be involved in ████ life. This Court would suggest that the parties cooperate to ensure that the grandparents, who live next door to stepfather, are a constant factor in ████ life. While procedurally the Court does not have the ability to grant visitation to grandparents at this time, there can be no question that for the benefit of ████ , the relationship between stepfather and grandparents must be mended. It is strongly suggested that stepfather permit frequent contact with grandparents while ████ is in stepfather's care. The animosity created between grandparents and stepfather is not lost on ████ , and that creates a very heartbreaking set of circumstances.

### (6) The child's sibling relationships.

If Plaintiff gets his wish as to the custody order, ████ would see his half-brother and half-sister only every other weekend. That result is unacceptable. The policy in Pennsylvania is to permit siblings to be raised

together, whenever possible (the doctrine of "family unity" or "whole family doctrine.") <u>Wiskoski v. Wiskoski</u>, 427 Pa.Super. 531, 629 A.2d 996, 999 (1993), appeal denied, 536 Pa. 646, 639 A.2d 33 (1994).

Absent compelling reasons to separate siblings, they should be reared in the same household to permit the "continuity and stability necessary for a young child's development." <u>Pilon v. Pilon</u>, 342 Pa.Super. 32, 492 A.2d 59, 60 (1985). This policy does not distinguish between half-siblings and siblings who share both biological parents. <u>In re Davis</u>, 502 Pa. 110, 465 A.2d 614. The factor while important is only one important factor-and not the controlling factor-in the ultimate custody decision. See, e.g., <u>E.A.L. v. L.J.W.</u>, 443 Pa.Super. 573, 662 A.2d 1109, 1118 (1995); <u>Cardamone v. Elshoff</u>, 442 Pa.Super. 263, 659 A.2d 575, 583-84 (1995); <u>M.D. v. B.D.</u>, 336 Pa.Super. 298, 485 A.2d 813, 816-17 (1984).

The sibling factor clearly and overwhelmingly weighs in favor of A.C. Defendant. ███ has been raised with his half-siblings, ███████ and ███████. At the time of the hearing, ███████ was six years old and ███ two. Cancer has taken his mom from him, and this Court is not inclined to have the legal system take him from his siblings. While circumstances dictate that ███ spend significant time away from ███████ and ███████ we will make every effort to construct an Order that ensures that ███ has a healthy and long lasting relationship with his half-brother and half-sister.

**(7) *The well-reasoned preference of the child, based on the child's maturity and judgment.***

███ indicated that he would prefer to live with his father, however, he had a difficult time explaining why he wanted to do so. Although it would be difficult for any young child to explain his reasons, ███ had an exceptionally difficult time coming up with any reasons. Father was clear on the witness stand that one of the main reasons he has proceeded with his efforts to obtain custody was due to the persistence of ███. The Court, however, does not see this as a compelling reason based on the young age of ███ and his inability to provide an explanation, or any credible reason for the preference.

*(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.*

No relevant evidence was presented to consider this factor.

*(9)(10) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs, and which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.*

Defendant is more likely to succeed in the long term in these areas. As pointed out by counsel for stepfather, "the best predictor of future behavior is past performance....." (Brief of Defendant p. 10). Stepfather has been vigilant in all developmental aspects of ████████ life and there is no reason to believe that this will change. ████████ is a wonderful young man due to his upbringing thus far, and many people have played a significant part in ████████ development. While the evidentiary burden is on stepfather, his role in raising ████████ cannot be ignored. Defendant has been a constant in ████████ life. ████████ has medical and educational needs that have been taken care of almost exclusively by stepfather over the course of the past year, and stepfather will continue to ensure that this will happen in the future. The credible emotion and love that projected from the witness stand during stepfather's testimony was noted.

*(11) The proximity of the residences of the parties.*

The parties live only 20 minutes apart; however, they live in different school districts.

*(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.*

Each party has an ability to provide adequate and appropriate child care, and it is anticipated that maternal grandparents and ████████ M.D. will continue to play significant and appropriate roles in this area when the parties are working.

(13) *The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.*

This Court finds that the parties have and will cooperate in the future for ███████ sake. The only significant level of conflict is the pronounced negativity directed toward stepfather from some members of mother's family. While those mentioned are not parties to this action, it should be addressed in the future to ensure that those who love and care for ███████ are able to work together for the sake of ███████ *T.'s.* development.

(14) *The history of drug or alcohol abuse of a party or member of a party's household.*

No relevant evidence was presented to consider this factor.

(15) *The mental and physical condition of a party or member of a party's household.*

No relevant evidence was presented to consider this factor.

(16) *Any other relevant factor.*

Many people have been involved in raising ███████, undoubtedly with the greatest contribution coming from his Mother. Until today, those involved have done an admirable job. ███████ is a polite and respectful young man who will succeed in the future. It is our hope that those involved in ███████ life will continue to work together for the benefit of ███████

WHEREFORE, based on the foregoing, this Court finds by clear and convincing evidence that the best interests of ███████ will be met with entry of the preceding Order.

By the Court:

_____
George N. Zanic, P.J.

Dated: April 3, 2014