J-S28016-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| LUKE SHEMO | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| PAIGE STANLEY | : | No. 315 MDA 2025 |

Appeal from the Order Entered February 10, 2025
In the Court of Common Pleas of Luzerne County Civil Division at No(s):
202401824

BEFORE:  BOWES, J., OLSON, J., and KING, J.

MEMORANDUM BY OLSON, J.:                    **FILED OCTOBER 14, 2025**

Luke Shemo ("Father") appeals from the February 10, 2025 custody order that, in relevant part, awarded Paige Stanley ("Mother") primary physical custody and him partial physical custody with respect to the parties' daughter, M.S. ("Child"), born in January 2024.[1]  After careful review, we affirm.

Child was born to Mother and Father out of wedlock.  At the time of Child's birth in January 2024, Mother and Father were no longer romantically involved.  *See* N.T., 9/30/24, at 43, 199-200; N.T., 11/26/24, at 41-42.  Despite Mother's invitation, Father did not attend the birth.  *See* N.T.,

---

[1] The order maintained shared legal custody.  Because the parties do not challenge this aspect of the custody order, we do not address it further in the instant writing.

9/30/24, at 16, 43-44. Notwithstanding further outreach by Mother, Father did not see Child until after paternity was established the following month. *See* N.T., 9/30/24, at 16-17, 44-47; N.T., 11/26/24, at 43-44.

The trial court aptly set forth, in part, the following procedural history:

> Father filed the present custody action on February 12, 2024, seeking shared legal and shared physical custody of [C]hild. . . .
>
> On February 27, 2024, Father filed a petition for special relief seeking shared legal and shared physical custody [on a 2-2-5 schedule] and the prohibition of both parties from making disparaging remarks about the other party in front of Child. [Father further expressed his disapproval regarding Mother's planned vacation to Aruba with Child.].
>
> On February 29, 2024, Mother filed an answer and counterclaim seeking shared legal custody and primary physical custody of Child[, as well as an answer to Father's petition for special relief].
>
> After [a] hearing held on March 1, 2024, the court entered an [interim] order allowing Mother to take Child to Aruba on a vacation for four [] nights, and [awarding] the parties . . . share[d] legal custody and physical custody on a 2-2-3 schedule.

Trial Court Opinion, 4/3/25, at 1-2 (cleaned up).

In the ensuing months, the court issued several additional interim orders pursuant to petitions for special relief and/or conciliation conferences, which, *inter alia*, maintained the above 2-2-3 custodial schedule and directed the matter to be scheduled for a custody trial. Additionally, pursuant to petition of Mother filed April 18, 2024, and subsequent to a conciliation conference held on May 23, 2024, the court entered an order by agreement on May 29, 2024 that, in part, scheduled a record hearing for July 3, 2024

J-S28016-25

before a hearing officer. This hearing was ultimately rescheduled for July 24, 2024.[2]

Thereafter, the court explained that,

[o]n July 1, 2024, Father filed an amended complaint seeking primary legal and primary physical custody. [Pursuant to order of the same date, the court scheduled a custody trial.].

On July 5, 2024, Mother filed a notice of proposed relocation to North Bergen, New Jersey. On July 17, 2024, Father filed a counter-affidavit opposing relocation.

. . .

*Id.* at 2-3 (cleaned up). Mother then filed a petition for modification on August 5, 2024, requesting the court schedule a hearing with respect to her proposed relocation, which the court did the following day.

Following a hearing on July 24, 2024, narrowed to several ancillary issues, the court filed an interim order on August 20, 2024, based upon the contemporaneously filed report and recommendations of the hearing officer.[3] This order again maintained the aforementioned 2-2-3 custodial schedule and became final pursuant to order of September 24, 2024. *See* Pa.R.C.P.

---

[2] We observe that Mother's petition, titled a petition for a conciliation conference, and requesting a conciliation conference on her counterclaim, is docketed as a petition for modification.

[3] These ancillary issues involved Child's attendance at church; the parties' right of first refusal; and the necessity for supervision of Father's paramour with Child. *See* Trial Court Opinion, 4/3/25, at 3.

- 3 -

1915.4-2(b)(5) ("If no exceptions are filed within the twenty-day period, the court shall review the report and, if approved, enter a final order.").

The court then conducted a custody/relocation trial on September 30, 2024, and November 26, 2024, with respect to Father's complaint for custody and Mother's counterclaim, as well as Mother's relocation request. Mother and Father were present and represented by counsel. Mother testified on her own behalf. She additionally presented the testimony of Father's stepmother, Tracey Shemo; neighbors and friends, Mariel Yedlock, Erynn Keating, Amanda Glidden, and Karli-Rose Cimino; and Father, as on cross-examination. Father also testified on his own behalf. He further adduced the testimony of his mother, Marlane Zlotek, and his sister, Lillie Shemo.

Mother testified that she is a registered nurse and studying to become a nurse practitioner. *See* N.T., 9/30/24, at 6-7, 144-151. She currently works from home assessing psychiatric patients *via* telehealth and testified that she has a flexible work and school schedule, allowing her to devote herself entirely to Child. *See id.* at 7-9, 76-77, 79-80, 83, 151-153, 155-158. She owns "a three[-]bed[room], two[-]bathroom home" in Kingston, Pennsylvania, where she resides with Child. *Id.* at 11-12. Child has her own room and playroom. *See id.* at 13. Mother further described, "I have two acres of land in the backyard. I have a swimming pool, a trampoline, a blow[-]up water slide, fenced in." *Id.* at 12-13; *see also id.* at 15. She additionally has a bounce house and a swing set. *See id.* at 15.

- 4 -

Father testified that he is a self-employed landscaper. *See* N.T., 9/30/24, 9-10; N.T., 11/26/24, at 37-38. He is unemployed in the months of December, January, February, and March but able to secure *per diem* work. *See* N.T., 11/26/24, at 39. He resides in his family home in Luzerne, Pennsylvania, "less than one mile" from Mother, with his mother, two sisters, and brother. *See* N.T., 9/30/24, at 11-12; N.T., 11/26/24, at 33-34, 36. Father shares a room with Child. *See* N.T., 11/26/24, at 35-36. He explained that the home "is on a double lot. It is a quarter acre, and we have a garden, backyard, deck." *Id.* at 36. Father testified that he attempts to structure his work schedule so that he serves as Child's primary caretaker during his custodial time. *See id.* at 37-39. He however acknowledged occasions where his mother or sister cared for Child during his custodial time so that he could work. *See id.* at 38.

By order dated February 7, 2025, and entered on February 10, 2025, the trial court denied Mother's request to relocate with Child to North Bergen, New Jersey.[4] *See* Order, 2/10/25, at ¶ 6. Further, the court granted Mother's request for primary physical custody. *See id.* at ¶¶ 2, 7. The court awarded Father partial physical custody as follows:

> (3) Father shall have partial physical custody of the minor child based on the following alternating schedule:
>
> > **Week One**: Wednesday and Thursday overnight with Father. (Father shall pick up the child Wednesday night at

---

[4] Mother did not challenge this determination by way of separate appeal.

5:30 p.m. Mother shall pick up the child on Friday morning at 7:00 a.m.)

**Week Two**: Thursday, Friday, and Saturday overnight with Father. (Father shall pick up the child Thursday night at 5:30 p.m. Mother shall pick up the child Sunday night at 5:30 p.m.)

(4) Additional time for Father to be exercised from November through March: Father shall be allowed two additional weeks (seven days) to exercise time with the child. The two additional weeks shall be non-consecutive. Father shall provide Mother with thirty days' notice of when he is exercising these additional periods. These periods shall not include Easter, Christmas or Thanksgiving Holidays.

*Id.* at ¶¶ 3, 4. The order also set forth, *inter alia*, a holiday and vacation schedule. *See id.* at ¶¶ 15, 16, 18. The court issued a contemporaneous opinion addressing, *inter alia*, the best interest factors set forth at 23 Pa.C.S.A. § 5328(a).

Father filed a timely notice of appeal on March 4, 2025.[5] On April 3, 2025, the trial court filed a responsive Rule 1925(a) opinion.

---

[5] Father failed to file a contemporaneous concise statement of errors complained of on appeal in violation of Pa.R.A.P. 1925(a)(2)(i) and (b). On March 6, 2025, the trial court ordered Father to file a concise statement by March 10, 2025. *See* Order, 3/6/25. Father complied. Because there is no claim of prejudice as a result of Father's procedural violation, we do not quash or dismiss Father's appeal. *See In re K.T.E.L.*, 983 A.2d 745, 748 (Pa. Super. 2009) (failure to file a 1925(b) statement concomitantly with a children's fast track appeal is considered a defective notice of appeal and will not be dismissed since failure to file the statement is a violation of a procedural rule and not an order of court); *Cf. J.P. v. S.P.*, 991 A.2d 904, 908 (Pa. Super. 2010) (holding that appellant waived all issues by failing to file a concise statement of errors complained of on appeal when directed by the trial court).

On appeal, Father raises the following issue for our review:

Did the trial court abuse its discretion or commit an error of law in its order, dated February 7, 2025, granting additional physical custody to [Mother] despite a lack of any substantive evidence supporting the change?

Father's Brief at 4 (unnecessary capitalization and suggested answer omitted).[6]

Our standard and scope of review in this context is well-established:

Our standard of review over a custody order is for a gross abuse of discretion. Such an abuse of discretion will only be found if the trial court, in reaching its conclusion, overrides or misapplies the law, or exercises judgment which is manifestly unreasonable, or reaches a conclusion that is the result of partiality, prejudice, bias, or ill-will as shown by the evidence of record.

In reviewing a custody order, we must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the trial court who viewed and assessed the witnesses first-hand. However, we are not bound by

_____

[6] We note with disapproval a procedural deficiency related to Father's brief. Specifically, the argument section of Father's brief is not framed by the issues raised with distinct headings and structure. Rather, Father provides 12 continuous, uninterrupted pages of discussion without heading, division, or separation. *See* Pa.R.A.P. 2119(a) (stating, "The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part—in distinctive type or in type distinctively displayed—the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent."). However, as we are able to discern the general issues raised and related arguments, and we perceive no prejudice, we proceed with the merits of Father's appeal. *See* Pa.R.A.P. 2101 (stating, "Briefs and reproduced records shall conform in all material respects with the requirements of these rules as nearly as the circumstances of the particular case will admit, otherwise they may be suppressed, and, if the defects are in the brief or reproduced record of the appellant and are substantial, the appeal or other matter may be quashed or dismissed.").

the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*Rogowski v. Kirven*, 291 A.3d 50, 60-61 (Pa. Super. 2023) (cleaned up).

"It is not this Court's function to determine whether the trial court reached the 'right' decision; rather, we must consider whether, 'based on the evidence presented, given [sic] due deference to the trial court's weight and credibility determinations,' the trial court erred or abused its discretion." *King v. King*, 889 A.2d 630, 632 (Pa. Super. 2005), *quoting Hanson v. Hanson*, 878 A.2d 127, 129 (Pa. Super. 2005).

"When a trial court orders a form of custody, the best interest of the child is paramount." *S.W.D. v. S.A.R.*, 96 A.3d 396, 400 (Pa. Super. 2014). "The best-interests standard, decided on a case-by-case basis, considers all factors which legitimately have an effect upon the child's physical, intellectual, moral and spiritual well-being." *M.J.N. v. J.K.*, 169 A.3d 108, 112 (Pa. Super. 2017). To that end, the Child Custody Act, 23 Pa.C.S.A. §§ 5321-5340, which governs child custody actions, sets forth 16 factors that a court must consider before making any custody determination. *See E.B. v. D.B.*, 209 A.3d 451, 460 (Pa. Super. 2019). "It is within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case." *Id.* at 468, *quoting M.J.M. v. M.L.G.*, 63 A.3d 331, 339 (Pa. Super. 2013).

Section 5328(a) sets forth the following factors that the court must consider when awarding custody:

**§ 5328.  Factors to consider when awarding custody**

**(a)  Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to ensure the safety of the child.

(2) The present and past abuse committed by a party or member of the party's household, which may include past or current protection from abuse or sexual violence protection orders where there has been a finding of abuse.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(2.2) Violent or assaultive behavior committed by a party.

(2.3) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party if contact is consistent with the safety needs of the child.

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life, except if changes are necessary to protect the safety of the child or a party.

(5)  The availability of extended family.

(6)  The child's sibling relationships.

(7)  The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a party to turn the child against the other party, except in cases of abuse where reasonable safety measures are necessary to protect the safety of the child.  A party's reasonable concerns for the safety of the child and the party's reasonable efforts to protect the child shall not be considered attempts to turn the child against the other party.

A child's deficient or negative relationship with a party shall not be presumed to be caused by the other party.

(9)  Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10)  Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11)  The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another.  A party's effort to protect a child or self from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14)  The history of drug or alcohol abuse of a party or member of a party's household.

(15)  The mental and physical condition of a party or member of a party's household.

(16)  Any other relevant factor.

**(a.1) Exception.--**A factor under subsection (a) shall not be adversely weighed against a party if the circumstances related to the factor were in response to abuse or necessary to protect the child or the abused party from harm and the party alleging abuse does not pose a risk to the safety of the child at the time of the custody hearing.  Temporary housing instability as a result of abuse shall not be considered against the party alleging abuse.

**(a.2) Determination.--**No single factor under subsection (a) shall by itself be determinative in the awarding of custody.  The court shall examine the totality of the circumstances, giving weighted consideration to the factors that affect the safety of the child, when issuing a custody order that is in the best interest of the child.

23 Pa.C.S.A. § 5328(a).[7]

In assessing these factors,

[a] trial court must "delineate the reasons for its decision when making an award of custody either on the record or in a written opinion." **S.W.D.**, [96 A.3d at 401]. **See also** 23 Pa.C.S.[A.] § 5323(a) and (d). However, "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." **M.J.M.**[, 63 A.3d at 336.].

**R.L. v. M.A.**, 209 A.3d 391, 395 (Pa. Super. 2019). While a parent's role in caring for a child may be considered in light of the statutory factors, "the primary caretaker doctrine, insofar as it required positive emphasis on the primary caretaker's status, is no longer viable." **M.J.M.**, 63 A.3d 331 at 339.

---

[7] Our General Assembly enacted significant amendments to the custody factors "pursuant to Act of April 15, 2024, P.L. 24, No. 8 (known as 'Kayden's Law')." **Velasquez v. Miranda**, 321 A.3d 876, 886 n.6 (Pa. 2024); **see** 2024 Pa. Legis. Serv. Act 2024-8 (S.B. 55). Specifically, Kayden's Law expands the factors to be considered in the custody court's best interest analysis by requiring the court to give "substantial weighted consideration" to, *inter alia*, the "safety of the child," which is defined as "the physical, emotional and psychological well-being of the child," and any "violent or assaultive behavior committed by a party." **Id.** In addition to new elements, our review of these amendments also reveals that the language of many of the factors have been substantively revised. **See** 23 Pa.C.S.A. § 5328(a)(1)-(2), (2.2)-(2.3), (4), (8). As Kayden's Law became effective on August 13, 2024, *i.e.*, a month prior to the commencement of the subject trial in this matter, the trial court properly applied it in this case.

While not applicable, we note that, on June 30, 2025, our General Assembly further amended Section 5328(a), with an effective date of August 29, 2025. **See** 2025 Pa. Legis. Serv. Act 2025-11 (H.B. 378). **See C.R.F. v. S.E.F.**, 45 A.3d 441, 445 (Pa. Super. 2012) (concluding that provisions of the Act apply "if the evidentiary proceeding commences on or after the effective date of the Act[.]").

In the case *sub judice*, the trial court addressed and analyzed the custody factors pursuant to Section 5328(a). **See** Trial Court Opinion, 2/10/25, at 12-16. The court found that Section 5328(a)(2.3), (3), (4), (10), and (12) were in favor of Mother. **See id.** at 13-15. Conversely, the court determined that Section 5328(a)(5) and (13) were in favor of Father. **See id.** The court found Section 5328(a)(6), (7), and (8) do not apply, and that the remainder of the factors were neutral. **See id.** at 12-16.

With regard to those factors in favor of Mother, the court found as follows:

. . .

(2.3) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party if contact is consistent with the safety needs of the child.

Mother does offer Father time on multiple occasions; however, Father declines the offers.

This factor weighs against Father and in favor of Mother.

(3) The parental duties performed by each party on behalf of the child.

Mother provides medical insurance, pays premiums and schedules medical appointments. Mother is available 24/7 when Child is in her care. Mother works from home and only has two patients a day at flexible times, which allows her to spend more time with Child personally.

This factor weighs for Mother.

(4) The need for stability and continuity in the child's and Mother's family life and community life, except if changes are necessary to protect the safety of the child or a party.

Mother emphasizes a routine, education, and medical care.

This factor weighs for Mother.

. . .

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

Mother testified that she is concerned that Child is not maintaining a stable sleep schedule when with Father. Mother scheduled twelve (12) of thirteen (13) pediatric appointments. There was an allegation that Father purposefully excluded Mother from a pediatric appointment.

This factor weighs for Mother.

. . .

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

This factor weighs for Mother.

. . .

Trial Court Opinion, 2/10/25, at 13-14 (cleaned up).

With regard to those factors if favor of Father, the court found as follows:

. . .

(5) The availability of extended family.

Mother lives alone. Father has a large family available to him.

This factor weighs for Father.

. . .

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child or self from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

Mother sought to paint Father as declining to attend the birth. February 9, 2024 is when Father was informed that he was officially declared as the father in the paternity test results.

Mother was critical of Father not attending the celebration after the [C]hild's baptism, but he did attend the actual baptism.

Father only attended one co-parenting session. The co-parenting counselor refused to continue counseling because of the conflict between the parties. Mother says Father is all about control and it is to the detriment to Child, for example, he gave Child some solid foods on a schedule contrary to what the pediatrician recommended.

Father refused to Facetime on Mom's vacation when Mom stated Child was saying her first word "Da Da." This is a high conflict family. The court was cognizant of the high conflict when crafting this unique schedule.

This factor weighs against Mother.

*Id.* at 13, 15 (cleaned up).

In support of its examination of the custody factors, the court further explained in its Rule 1925(a) opinion:

Mother works from home and is available to Child at all times. She is a nurse who sees patients by telehealth at 9:00 a.m. and 11:00 a.m. and makes her own hours. Father on the other hand is a self-employed landscaper who has no employees. He relies on family for custody exchanges and admittedly has had to work on the days he has custody. When the court fashioned an equal schedule whereby Father could spend the mornings with Child, the evidence showed that Father was at work rather than with Child, despite Father being self-employed.

Mother testified that out of [13] pediatric appointments, she scheduled [12] and Father one. Father disagreed but testified

he scheduled two appointments. Mother further testified, credibly, that out of [12] doctor's appointments, he attended two.

When it comes to activities that the parents are involved in with Child, Mother excels, while Father's participation is far less by comparison. Mother enrolled Child in an infant rescue swim [program]. Father rejected the idea and would not contribute to the cost. The program runs for four days and on his two days he would not take Child. Mother [also] enrolled Child in a developmental program at a local school which teaches a child how to stand, crawl and interact with other children. Father[] respon[ded,] "I will not be attending."

Mother testified to many occasions where she tried to get Father to have more time with Child, but usually with no response. On one occasion, when Mother and Child were on vacation, Child, just an infant, sat up and spoke her first words, "Da[] Da," and Mother tried to have Father see it all on Facetime. H[e] respon[ded,] "That's great; however, Facetimes will be more for when she is cognitively aware."

While Mother offered Father more physical custodial time, when she asked for an additional two hours for her brother's graduation and party his response was "no."

Trial Court Opinion, 4/3/25, at 11-13 (cleaned up) (citations to record omitted).

Father argues that the record does not support the trial court's factual findings and its determinations regarding credibility and weight of the evidence. *See* Father's Brief at 11-23. To the extent that Father raises challenges to statutory factors other than Section 5328(a)(2.3), (3), (4), (10), and (12), we conclude that Father waived any such argument for failure to raise same in his Rule 1925(b) concise statement. *See In re M.Z.T.M.W.*, 163 A.3d 462, 466 (Pa. Super. 2017) ("[I]t is well-settled that issues not

included in an appellant's statement of questions involved and concise statement of errors complained of on appeal are waived.")(citation omitted).

While styled in terms of sufficiency of the evidence, Father's claim ultimately sounds in credibility and weight of the evidence. Specifically, in assailing the court's examination of the custody factors, he asserts that the court ignored relevant evidence. *See* Father's Brief at 16-23.

With respect to Section 5328(a)(2.3), which party is more likely to encourage and permit frequent and continuing contact between the child and another party if contact is consistent with the safety needs of the child, Father asserts that the court disregarded evidence of Mother's denigration of Father and his family, including allegedly telling Father to kill himself. *See id.* at 16-17. Father states, "The [trial court] disregarded a large amount of evidence concerning Mother's behavior towards Father which will have a chilling impact on Father's relationship with [C]hild." *Id.* at 17. He continues, "This level of animosity is not healthy for [C]hild and was completely disregarded by the [trial court] in [its] custody determination except for [its] recommendation that Mother seek personal therapy." *Id.*

As to Section 5328(a)(3), the parental duties performed by each party on behalf of the child, Father argues that the shared nature of the physical custody schedule rendered this factor neutral as each party performed parental duties. *See id.* Father emphasizes his testimony that "since he works for himself, he did his best to schedule his work for when he does not

have custody and that[,] when he has custody[,] he is the primary caregiver." *Id.* at 18. Father contends that this is supported by the testimony of his sister that he attempts to serve as Child's primary caregiver "as often as he can." *Id.* Further, Father maintains that Mother's testimony regarding her work schedule is not credible. *See id.*

As to Section 5328(a)(4), the need for stability and continuity in the child's education, family life and community life, except if changes are necessary to protect the safety of the child or a party, Father baldly argues that he is able to provide stability and continuity and that the court "inappropriately disregarded" evidence as to his care of Child. *Id.*

With respect to Section 5328(a)(10), which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child, Father maintains that the court disregarded evidence of his attendance at pre-scheduled medical appointments. *See id.* at 20. He additionally points to Mother's testimony that she would continue to use a rectal thermometer, despite an incident where this could have caused Child to bleed due to a perforated bowel, as well as Mother's refusal to provide Father information following medical appointments. *See id.* at 20-21.

Finally, as to Section 5328(a)(12), each party's availability to care for the child or ability to make appropriate child-care arrangements, Father indicates that he resides with his mother, sister, and brother, whereas "Mother resides alone[,] and her testimony regarding her schedule is not credible."

*Id.* at 21. He asserts that the court disregarded that Mother uses no other caregivers. Therefore, as she works from home, and her testimony regarding her schedule is not credible, he asserts that the court ignored the adequacy of Mother's supervision of Child, particularly once Child is mobile. *See id.*

Because Father's issue, at its core, disputes the trial court's determinations regarding credibility and weight of the evidence, it fails. *See Rogowski*, 291 A.3d at 60-61 (reiterating that we defer to the trial court on matters of credibility and weight of the evidence, as the trial court viewed and assessed witnesses firsthand). Further, in custody cases, it is well-established that it is within the purview of the trial court to determine which statutory factors "are most salient and critical." *E.B.*, 209 A.3d at 460.

However, inasmuch as Father argues that the trial court's determinations with respect to the foregoing factors were not supported by the record, these claims are belied by the testimonial evidence. Mother testified to her "countless" attempts to offer Father additional time with Child, which he declined. *See* N.T., 9/30/24, at 43-44, 46-47, 55-64. This included efforts to engage Father since Child's birth, prior to the inception of the existing custody order. *See id.* at 16-17, 43-44. Mother stated, "I went as far as reaching out to almost every family member, multiple text messages to him, multiple e-mails and phone calls to [Father's former attorney] for him to see his daughter." *Id.* at 43. She continued,

> This started when . . . I was pregnant. I asked him since that day
> until still currently to be involved in his child's life. Even after our

relationship ended, after we went our separate ways[,] I still tried to tell him, hey, just come to her birth, come to the appointments.

After she was born, please come meet your daughter. Please come to the hospital to see her. Please come to my home.

*Id.* at 43-44. Father failed to respond "until almost February of 2024." *Id.* at 44. Mother's efforts then continued even after the issuance of the existing custody order. *See* N.T., 9/30/24, at 55-64. This was confirmed by Mother's friends and neighbors. *See id.* at 210-244. In contrast, when Mother, for example, requested additional time to bring Child to her brother's graduation, Father said no. *See id.* at 64-65.

As to the care of Child during her custodial time, Mother testified as follows:

Q. Who cooks for her?

A. Me.

Q. Who buy her clothes?

A. Me.

Q. Who takes care of her hygiene?

A. Me.

Q. Who bath[e]s her?

A. Me.

Q. Who transports her to and from her pediatrician events?

A. Me.

Q. Who transports her to and from the extracurricular activities that she's engaged in?

A. Me.

Q. Who schedules her doctor appointments with the exception of that one?

A. Me.

*Id.* at 76-77. Mother continued, "I'm the one that's caring for her 24 hours a day . . . . She's not going with anybody else." *Id.* at 79-80; *see also id.* at 100-102.

Mother testified, however, that during Father's custodial time others care for Child due to his work schedule. *See id.* at 78, 102. She stated, "I do the exchanges with my daughter. Therefore, when I'm exchanging [C]hild[,] I see his home and his vehicle that he drives is not there. The vehicle is never there. He's never there during the exchanges. It's the person who's babysitting [that] is doing the exchanges." *Id.* Mother indicated that these babysitters include Father's mother, sisters, and girlfriend. *See id.* at 79. Father conceded that he has asked to return Child early due to his work schedule. *See* N.T., 11/26/24, at 103-105. Further, his sister confirmed that, during his custodial time, she cares for Child for up to six hours a day two to three times per week so that Father can work. *See id.* at 151-155.

While it is well-settled that "a parent's work schedule may not deprive that parent of custody if suitable arrangements are made for the child's care in his or her absence," the record further corroborates Mother's overall participation and involvement with Child as compared to Father. *Gerber v.*

*Gerber*, 487 A.2d 413, 416 (Pa. Super. 1985) (citations omitted). Mother enrolled Child in an infant rescue swim program aimed at "reduc[ing] the risks of drowning" as well as a class, "Cuddly, Crawling, and Curiosity," that Mother described "teach[es Child] how to stand, they teach her how to crawl. She interacts with children her age, which is like parallel play or independent play with them. She -- it's curiosity. Children at that age don't know the world so they give them all these toys that help with developmental, color, lights." N.T., 9/30/24, at 31-34. Father declined to attend or pay for these classes and refused to permit Mother to take Child during his custodial time. *See id.* at 31-32, 35-36 ("You're entitled to take her on your days. I will not be attending[,] and I will not be paying for half. You can do what you want on your days."); N.T., 11/26/24, at 50.

Further, Mother provides Child's medical insurance to which Father does not contribute and scheduled and attended the majority of Child's medical appointments. *See* N.T., 9/30/24, at 26, 28-29, 83, 99-100, 164-167; N.T., 11/26/24, at 47, 86-87. She recounted numerous medical issues upon Child's return from Father's custodial time and testified to her concern about Child's sleep schedule and routine while in Father's care. *See* N.T., 9/30/24, at 80, 83-99, 175. Mother stated, "She's coming home -- her sleep patterns are awful. It's a constant fight when she goes home with getting her back on a normal routine." *Id.* at 80. Similarly, she testified to Father's disregard of medical advice as to how foods are being introduced to Child:

[W]e went to a pediatrician and when she was introduced to solid foods, she said, "It's very important to introduce foods one food at a time for three days -- three to four days to ensure there's no allergy and no reaction." So . . . I gave her bananas. . . . I gave her bananas for one day. The next day she was going to Dad's house. I provided him with [a] banana. I give him the banana. He said, "I'm not doing this. I'm going to introduce whatever foods I want to introduce."

*Id.* at 54-55.

Instantly, the trial court's consideration of the custody factors was careful and thorough. After careful review of the record, we hold that the court's factual findings are supported by the record, and the court's conclusions in light of those findings are reasonable.

Thus, as the record supports the court's findings, we discern no abuse of discretion. *See Rogowski*, 291 A.3d at 60-61; *King*, 889 A.2d at 632.

For the foregoing reasons, we affirm the trial court's order.

Order affirmed.

Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/14/2025