J-A04029-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| BRIANNA R. SENAPE | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ROBERT M. SENAPE | : | |
| | : | |
| Appellant | : | No. 718 MDA 2025 |

Appeal from the Order Entered May 28, 2025
In the Court of Common Pleas of Luzerne County Civil Division at No(s):
202003883

BEFORE:  PANELLA, P.J.E., KING, J., and LANE, J.

MEMORANDUM BY KING, J.:                    **FILED: FEBRUARY 27, 2026**

Appellant, Robert M. Senape ("Father"), appeals from the order entered in the Luzerne County Court of Common Pleas, which granted Appellee, Brianna R. Senape ("Mother"),[1] primary physical custody of their minor child, O.S. ("Child").  We affirm.

The relevant facts and procedural history of this matter are as follows. The parties were married on May 24, 2019, and Child was born in June 2019. In March 2020, the parties separated.  On March 11, 2020, Mother filed a complaint for custody.  On May 6, 2020, the court entered an initial custody order, granting Mother primary physical custody, and Father partial physical custody.

On February 1, 2023, the parties entered into a stipulated modification

_____

[1] Mother has since remarried and is also known as Brianna Senape Antosh.

of custody, in which the parties shared legal and physical custody of Child. However, on November 16, 2023, Father filed a petition to modify custody, seeking primary physical custody of Child. On January 8, 2024, Mother filed an answer and petition to modify custody, also seeking primary custody. On January 10, 2024, the court appointed a guardian *ad litem* ("GAL") for Child.

Prior to trial, Father withdrew his request for primary physical custody and requested that the court maintain the current custody arrangement; Mother, however, pursued her request for primary physical custody.

On August 22, 2024, the court began a custody trial. At that time, Father called Nicole Seip, RN, a nurse at Child's pediatrician's office. Nurse Seip testified that Mother had called to reschedule one of Child's medical appointments because she was running late due to bad weather.[2] Father also testified on his own behalf regarding the conflicts both parents had regarding Child's medical care and failed attempts at co-parenting. Father admitted to using physical discipline on Child and requested that the court allow him to continue disciplining Child in such a manner. On cross-examination, Mother's counsel questioned Father about instances in which he had purposely withheld Child from Mother, and instances in which Father had video taped Child stating that he did not want to do things Mother wanted him to do, such as t-ball. Mother's counsel also questioned Father about several social media postings

---

[2] Father also introduced text messages from Mother in which Mother had stated the doctor's office had cancelled Child's appointment on that date.

Father and Father's wife ("Stepmother") had made about Mother and her competency to parent Child.

On September 4, 2024, the court entered an interim custody order continuing the shared custody schedule until testimony could resume.

On January 28, 2025, Father filed for a protection from abuse ("PFA") order on behalf of Child. On January 30, 2025, following an *in camera* interview with Child and in-court testimony regarding the PFA, the court denied Father's request for a PFA order.

On May 19, 2025, the court again convened for a continued custody trial. At this time, Mother testified on her own behalf. Among other things, she testified that Father and Stepmother had attempted to alienate Child from her, and that they encouraged Child to call her by the disparaging name "Freeland," the county where she was raised, rather than "Mom." Mother also testified regarding her unsuccessful attempts to co-parent with Father, including but not limited to many occasions on which Father improperly withheld Child during Mother's custody time, as well as Father's refusal to permit Child to attend Catholic catechism classes. Mother also testified regarding Stepmother's negative influence on her life and relationship with Child, including that she had lost her employment as a classroom aide at Child's school due to Father and Stepmother's repeated complaints to the school administration. Additionally, Mother testified that she did not want corporal punishment reinstated because Child is sensitive and afraid of being disciplined in such a manner.

Father called Cara Phillips, Esquire, Child's GAL, to testify as a witness. Attorney Phillips testified regarding Stepmother's attitude and involvement, and the fact that Child picked up on how Stepmother felt about Mother, particularly given how much time Stepmother spent with Child while Father worked. Attorney Phillips stated that if this factor were given more weight, it would be more appropriate for Mother to have primary custody. Finally, Father gave additional testimony, attempting to address concerns Mother had raised during her own testimony. Father reiterated his belief that physical discipline was appropriate in the home. Further, while being questioned by the trial court, Father, unprompted, referred to Mother as "Freeland" in open court. (**See** N.T. 5/19/25, at 165-66).

On May 28, 2025, the court entered an order awarding Mother primary physical custody of Child. On June 2, 2025, Father timely filed a notice of appeal and concise statement of errors complained of on appeal.

Father raises the following issues for review:

> A. Did the Trial Court commit an abuse of discretion in awarding Appellee/Plaintiff/Mother Brianna Senape Antosh primary physical custody of the Minor Child?
>
> B. Did the Trial Court commit an error of law in awarding Appellee/Plaintiff/Mother Brianna Senape Antosh primary physical custody of the Minor Child?
>
> C. Did the Trial Court rely on insufficient evidentiary support in awarding Appellee/Plaintiff/Mother Brianna Senape Antosh primary physical custody of the Minor Child, such that said decision was against the weight of the evidence presented by the Parties.

- 4 -

(Father's Brief at 6).

Father's issues are related and we address them together. Father asserts that the trial court erred by awarding primary physical custody to Mother. Specifically, Father challenges the court's analysis of custody factors 2.3, 3, 4, 8, 9, 10, and 12 for the reasons that follow.

With respect to factor 2.3, which party is more likely to encourage and permit frequent and continuing contact between Child and the other parent, Father contends that the court erred in finding that he engaged in parental alienation. Father insists that he has not withheld Child from Mother since the time the parties began exercising the initial shared custody schedule, and he maintains that the court also overlooked testimony that Mother had withheld Child from Father over the July 4th holiday weekend.

Regarding factor 3, the parental duties performed by each party, Father argues that he testified regarding his involvement with Child's schooling, but the court overlooked this testimony.

As it relates to factor 4, the need for stability and continuity in Child's family and community life, Father claims that he testified extensively about Child's routine in his home, including the types of discipline he utilizes, activities he does with Child, and his plans for Child's school attendance, extra-curricular activities, and medical appointments.

With regard to factor 8, the attempts of a party to turn the child against the other party, Father complains that the court placed too much emphasis on the use of the name "Freeland" as a derogatory name for Mother in the home.

Although the court noted that Father "slipped up" and referred to Mother as "Freeland" in court, Father contends that it was in fact the trial court that used the term at that instance.

Regarding factor 9, which party is more likely to maintain a loving, stable, consistent, and nurturing relationship with the child, adequate for the child's emotional needs, Father maintains that the trial court's finding that Father and Stepmother interfered with Mother's employment at Child's school was not substantiated by any other independent evidence other than Mother's testimony.

With respect to factor 10, which party is more likely to attend to the daily physical, emotional developmental, educational, and special needs of the child, and factor 12, each party's availability to care for child or make appropriate childcare arrangements, Father highlights the court's findings that Mother does not work and is therefore available at all times to Child. Father asserts that this reasoning essentially punishes Father for his work schedule, and that this is an unfair finding where Father is able to make appropriate childcare arrangements.

Father also generally complains that the court's findings in favor of Mother were erroneous because the court should not have found Mother's testimony credible. Father emphasizes his presentation of testimony from a nurse at Child's pediatrician's office, who stated that Mother called the doctor's office requesting to cancel a medical appointment due to the fact that she was running late. Father insists this testimony refuted Mother's claim to Father in

text messages that Child's appointment had been cancelled by the doctor's office. Father concedes that this is only one example of Mother's dishonesty but he submits that it shows that Mother's testimony is wholly unreliable. Father concludes that the court abused its discretion in awarding Mother primary physical custody, and this Court must grant relief. We disagree.

The following principles apply to our review of a custody order:

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*E.C.S. v. M.C.S.*, 256 A.3d 449, 457-58 (Pa.Super. 2021) (quoting *S.T. v. R.W.*, 192 A.3d 1155, 1160 (Pa.Super. 2018)).

> [I]t is not this Court's function to determine whether the trial court reached the 'right' decision; rather, we must consider whether, 'based on the evidence presented, given due deference to the trial court's weight and credibility determinations,' the trial court erred or abused its discretion in awarding custody to the prevailing party.

*E.B. v. D.B.*, 209 A.3d 451, 468 (Pa.Super. 2019) (quoting *King v. King*, 889 A.2d 630, 632 (Pa.Super. 2005)).

With any child custody case, the paramount concern is the

best interests of the child. This standard requires a case-by-case assessment of all the factors that may legitimately affect the physical, intellectual, moral and spiritual well-being of the child.

*M.J.M. v. M.L.G.*, 63 A.3d 331, 334 (Pa.Super. 2013), *appeal denied*, 620 Pa. 710, 68 A.3d 909 (2013) (quoting *J.R.M. v. J.E.A.*, 33 A.3d 647, 650 (Pa.Super. 2011)).

The parties cannot dictate the amount of weight the trial court places on the evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

*R.M.G., Jr. v. F.M.G.*, 986 A.2d 1234, 1237 (Pa.Super. 2009) (quoting *S.M. v. J.M.*, 811 A.2d 621, 623 (Pa.Super. 2002)).

At the time of the court's custody decision, the Child Custody Act provided:

**§ 5328. Factors to consider when awarding custody**

**(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving substantial weighted consideration to the factors specified under paragraphs (1), (2), (2.1) and (2.2) which affect the safety of the child, including the following:

(1) Which party is more likely to ensure the safety of the child.

(2) The present and past abuse committed by a party or member of the party's household, which may include past or current protection from abuse or sexual violence protection orders where there has been a finding of abuse.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(2.2) Violent or assaultive behavior committed by a party.

(2.3) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party if contact is consistent with the safety needs of the child.

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life, except if changes are necessary to protect the safety of the child or a party.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's developmental stage, maturity and judgment.

(8) The attempts of a party to turn the child against the other party, except in cases of abuse where reasonable safety measures are necessary to protect the safety of the child. A party's reasonable concerns for the safety of the child and the party's reasonable efforts to protect the child shall not be considered attempts to turn the child against the other party. A child's deficient or negative relationship with a party shall not be presumed to be caused by the other party.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child or self from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a) (effective August 13, 2024 to August 28, 2025).

Instantly, the trial court evaluated the custody factors and found the following factors either neutral or inapplicable: (1), (2), (2.1), (2.2), (5), (6), (7), (11), (14), (15), and (16). Father does not challenge the court's findings as to these factors. With respect to the remaining factors, the court reasoned:

(2.3) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party if contact is consistent with the safety needs of the child.

This case is one of the greatest cases of gross alienation that this [c]ourt has encountered since taking the bench.

**This factor weighs heavily against Father and in favor of Mother**.

(3) The parental duties performed by each party on behalf of the child.

**This factor weighs for Mother.** Mother is more involved with providing for the child's needs even with

- 10 -

small things such as clean clothing and keeping up with the child's school needs.

(4) The need for stability and continuity in the child's education, family life and community life, except if changes are necessary to protect the safety of the child or a party.

Mother emphasizes a routine, education, and medical care.

**This factor weighs in favor of Mother.**

*   *   *

(8) The attempts of a party to turn the child against the other party, except in cases of abuse where reasonable safety measures are necessary to protect the safety of the child. A party's reasonable concerns for the safety of the child and the party's reasonable efforts to protect the child shall not be considered attempts to turn the child against the other party. A child's deficient or negative relationship with a party shall not be presumed to be caused by the other party.

Father engages in Parental Alienation of the child from his Mother. The Father and child call the Mother "Freeland" when in Father's care as a derogatory term instead of "Mom". The therapist confirmed that the child consistently calls [Mother] "Freeland". **This factor weighs heavily against Father.**

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

**This factor weighs against Father.** Father is unwilling to put his son's emotional needs first. Father was willing to jeopardize his child being able to see his Mother at his own school and willing to risk him losing the benefits of that connection because he put his own selfish needs and insecurities above his own child. Father tried to limit Mother's employment in order to meet the emotional needs of his wife who did not want mother coming out to greet her own child in the parking lot.

- 11 -

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

Father is not currently able to attend the child's extracurricular sporting events whereas Mother ensured that he was signed up and that he attends his games. **This factor weighs for Mother.**

\* \* \*

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

Since Mother no longer works she is available 24/7 for the child. Father's caretaker is his wife who is not an appropriate caretaker for the child as she cannot be trusted to act and speak in a manner that will ensure the emotional well-being of the child. **This factor weighs for Mother and against Father.**

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child or self from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

**This factor weighs against Father.** Father testified on the most recent day of trial that he has "no concerns with what my wife does."

This is deeply concern[ing] to the [c]ourt. The limited schedule will reduce the number of exchanges which the child is subjected to. It will also ensure that [Stepmother's] behavior is not negatively impacting the child.

\* \* \*

(Custody Order and Opinion, 5/8/25, at 10-13) (emphasis in original).

In its Pa.R.A.P. 1925(a) opinion, the trial court further explained its

reasoning as follows:

### Name-calling and Mislabeling Mother as a form of Alienation

The most significant finding that this [c]ourt gleaned from the evidence presented in this case is the extent to which Father's actions or inactions have been directed toward alienation of the child from his mother.  Father, his wife, and the child all refer to Mother as "Freeland," which is a calculated action.  It does, in fact, demean Mother.  Father encourages such conduct from the child and his wife.  He also does not dissuade or prevent the name-calling or mislabeling of [Child's] Mother.  On the last day of trial, Father testified with regard to his wife, stating, "**I don't believe she's trying to turn [Child] against Freeland in any way.**  I believe she's showing [Child] love and the affection he deserves."  [(N.T. 5/19/25, at 166)].

**It should be noted that Father accidentally slipped and called Mother "Freeland" in open [c]ourt during his testimony in front of this jurist.**  Then Father stated, "The more and more I hear that, it[']s just not—coming from a third party, it's not good.  Stupid on my part."  [(**See id.**)]

This [c]ourt disagreed that this treatment of Mother in front of the child is in the child's best interest.  Father's testimony that the reference to "Freeland" originated with the child is simply not believable.  The child's testimony during the judicial interview regarding the name "Freeland" was "[d]ad named the name."  [(**See In Camera** Hearing, 1/30/25, at 14)].  The child further stated that use of the term was "not nice."  [(**See id.** at 15)].  Obviously, the child knows it is not appropriate but continues to call his Mother that name because his Father and stepmother [want] it that way.  The child's counselor testified that the child consistently calls Mother "Freeland," and Father's wife "Mom."  [(N.T. 1/30/25, at 36-38)].

The sample of social media postings shows that Father and his wife only express disdain for Mother.  The impact of such attitudes can only emotionally harm the child.  In one posting Father refers to Mother as the child's "egg donor."

In another posting stepmother refers to Mother as "such a scumbag."

Father testified that he has "no concerns with what my wife does." [(N.T. 5/19/25, at 150)].

### Child's Emotional Needs

The [c]ourt further found that given the circumstances, Mother is more likely to maintain a loving, stable, consistent, and nurturing relationship with the child in order to meet the child's emotional needs. Father, himself, testified that Mother identified that the child was "sensitive" and in his testimony he seemed to agree. [(*See* N.T. 5/19/25, at 163)].

Father is unwilling to put his son's emotional needs first. Father was willing to jeopardize his child being able to see his Mother at his own school and willing to risk him losing the benefits of that connection because he put his own selfish needs and insecurities above his own child. Father tried to limit Mother's employment in order to meet the emotional needs of his wife who did not want Mother coming out to greet her own child in the parking lot.

### Loss of Mother's Employment at the Child's School

An example of Father's animosity towards Mother and how it affects the child, is the situation where the child is attending Valley Elementary School and where Mother is now no longer able to work at the child's school. Father had knowledge that Mother obtained employment at the child's school. Father questioned whether Mother was using her position to have contact with her own son during his days of custody. The stepmother alleged that she was not comfortable with Mother being in the parking lot when stepmother was dropping the child off at school. Ultimately, Father's complaints resulted in Mother's employers/school authorities bringing her into a meeting and giving her an ultimatum regarding her employment at the school.

The [c]ourt found Mother's testimony credible in that she did not in any way intimidate stepmother at the school and, in fact, did not want to speak to stepmother. This incident

- 14 -

deprived the child of having a familiar family member at his school.

### Withholding of the Child from Mother

The evidence in the record supports a finding that Father has several times withheld the child from Mother during times when she was supposed to have custody of the child. It should be noted that after a full day of a Protection From Abuse (PFA) hearing in this case, where the [c]ourt entertained a PFA rather than the schedule[d] day of custody trial, the PFA was ultimately dismissed after the child interview. As this judge was exiting the court room Father stated that he and Mother work well together co-parenting and that "this was just a hiccup." [(**See** N.T. 5/19/25, at 163)]. In fact, the PFA granted Father temporary physical custody of the child and restricted Mother's periods of custody. In the eyes of the judicial system, PFA's are not considered "hiccups" and, in fact, can have drastic consequences.

### Father's Unavailability and Increased Time with stepmother

The testimony further establishes that Mother is active in scheduling and attending medical appointments; attends the child's extracurricular activities while Father does not and offers to take the child to activities during Father's custodial times when he cannot, with no response from Father.

Mother is not employed and is available 24/7 to care for the child. Father has a full-time work schedule and relies on his wife, whose disdain for Mother only contributes to the continued conflict between Mother and Father.

On the other hand, Father testified he and his wife have to work; his parents are older, and his wife's family reside in Lackawanna County. His wife works during the night shift and she is available during the day when he is at work. Father testified that when he is working he must rely on his wife to care for the child, which only contributes to the alienation occurring between Mother and child.

> The GAL testified at the trial on May 19, 2025, and although she stated the shared custody schedule is working, she further stated stepmother is very critical of Mother and if that factor is given more weight, Mother should then have primary custody. Also, the GAL testified that Mother has made it a point to never be critical of Father's household around the child.
>
> This [c]ourt was highly concerned with the unfettered access that stepmother has to the child while there is an active agenda of parental alienation being carried out against Mother. This [c]ourt crafted a physical custody Order that would immediately begin to correct the parental alienation that was occurring.

(*See* Trial Court Opinion, 7/3/25, at 7-12) (footnotes and some internal citations to the record omitted).

Our review of the record supports the court's findings. Essentially, the court found that the testimony established that Father and Stepmother had engaged in a campaign of disparaging and alienating Mother from Child and fashioned a custody schedule that would address what the court felt were the most persistent threats to Child's emotional well-being. Father now is asking us to re-weigh the evidence in his favor and disregard the court's credibility determinations. However, such decisions are within the sole purview of the trial court and, where the record supports those findings, we decline to disturb

them.[3]  *See E.C.S., supra*.[4]

Here, the trial court had the benefit of several years of litigation in this matter, as well as several custody hearings and a PFA hearing, in order to make its factual and credibility findings.  On this record, we cannot say that the court erred or abused its discretion in awarding primary physical custody to Mother.  Rather, the record makes clear the court thoroughly considered the best interests of Child in making its custody decision.  *See E.B., supra*.  Accordingly, we affirm.

Order affirmed.

_____

[3] Further, many of Father's arguments misstate the record.  For example, he asserts that the trial court called Mother "Freeland" in court, but the notes of testimony show that Father was the one who stated, unprompted, that he did not believe Stepmother was "trying to turn [Child] against Freeland in any way."  (*See* N.T. 5/19/25, at 165-66).  When the court responded, "You said, 'I don't believe she's trying to turn [Child] against Freeland,'" Father went on to state that, "And from his mother, Freeland, it's just like, yeah.  Normally, I hear that, it sounds bad[.]"  (*See id.* at 166).

[4] We note that the court did not address the issue of Nurse Seip's testimony.  Nurse Seip testified that she was employed at Child's pediatrician's office on April 4, 2024, and that the electronic system indicated that Mother had called to reschedule an appointment because there was bad weather in her area, and as result of the weather, she was running late.  (*See* N.T. 8/22/24, at 11).  Nurse Seip testified it was office policy to reschedule visits where patients would be more than 15 minutes late.  (*See id.*).  Father did not further question Nurse Seip.  Father then testified that, on April 4, 2024, Mother had texted him to say that the doctor had called her and rescheduled the appointment because of the weather.  (*See id.* at 50-51).  Even if Mother had been dishonest in this instance, this Court has held that the parties cannot dictate the weight the trial court places on the evidence.  *See R.M.G., supra*.  It is clear from the court's findings that given the entirety of the testimony and history of the case, the trial court did not place much weight upon this inconsistency.  *See id.*

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/27/2026