J-A04023-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| MICHAEL R. POTTS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LINDSEY M. POTTS | : | No. 1395 MDA 2025 |

Appeal from the Order Entered September 11, 2025
In the Court of Common Pleas of York County Civil Division at No(s):
2024-FC-001478-03

BEFORE:  PANELLA, P.J.E., KING, J., and LANE, J.

MEMORANDUM BY KING, J.:                    **FILED MARCH 13, 2026**

Appellant, Michael R. Potts ("Father"), appeals from the order entered in the York County Court of Common Pleas, which granted Appellee, Lindsey M. Potts ("Mother"), primary physical custody of the parties' minor children, A.G.P. and A.P.P. ("Children").  We affirm.

The relevant facts and procedural history of this case are as follows. Father and Mother are the parents of A.G.P., born in 2014, and A.P.P., born in 2021.  Mother and Father separated in January of 2023.  On July 12, 2024, Father filed a complaint seeking shared legal and physical custody of Children. Father sought an alternating 2-2-3 physical custody schedule during the school year.  Under Father's proposed schedule, Father would have overnight custody of Children on Monday and Tuesday, Mother would have overnight custody on Wednesday and Thursday, and Father would have overnight custody on the weekend, alternating between the parties every week.  On

September 5, 2024, the court entered an interim custody order that implemented the custody schedule the parties maintained prior to the filing of the custody complaint. The interim order granted Mother primary physical custody of Children with Father having partial physical custody on alternating weekends and on Tuesdays and Thursdays from 4:30 p.m. until 8:00 p.m.

On November 27, 2024, the court interviewed A.G.P. in the presence of counsel for both parties. A.G.P., who was ten years old at the time, stated that she lives at Mother's house with Mother and her sister. Mother's boyfriend, Todd McClintock, also sometimes stays at Mother's house. A.G.P. stated that he is "nice and kind." (N.T. Child Interview, 11/27/24, at 15). She further described Mother's house as "warm and cozy" and stated that she and her sister have their own rooms at Mother's house. (*Id.* at 9). On a school day, Mother typically takes Children to Mother's parents' house around 7:30 a.m. A.G.P. gets on the school bus from her grandparents' house and returns to her grandparents' house after school. She and her sister typically eat dinner at their grandparents' house. A.G.P. stated that she and her sister have a good relationship with their grandparents. Mother picks Children up at 5:00 p.m. A.G.P. typically goes to bed around 9:30 p.m.

A.G.P. spends time at Father's house on Tuesday and Thursday evenings and every other weekend. A.G.P. stated that her stepmother and her stepbrother live with Father and she has a good relationship with both of them. She further reported that A.P.P. also gets along well with their stepmother and stepbrother. When A.G.P. is at Father's house on the weekends, they

- 2 -

spend time at the house and sometimes go out to do activities. They typically go to church on Sundays, which she enjoys doing. A.G.P. shares a room with her sister at Father's house. She typically goes to bed around 10:30 p.m. at Father's house because it is the weekend. On Tuesdays and Thursdays, Father picks Children up from Mother's parents' house. They typically go to Father's house to eat dinner and go to their stepbrother's basketball practices. A.G.P. stated that she likes the current schedule of time spent with her parents and she would not want to change the schedule. When asked how she feels about potentially spending more time at Father's house, A.G.P. responded, "I don't know." (*Id.* at 18).

The court conducted a custody hearing on December 6, 2024. Father testified that he married Alesha Potts ("Stepmother") on April 11, 2024. He lives with Stepmother and her son, A. ("Stepbrother"), who is 10 years old. Stepmother has primary custody of Stepbrother and Stepbrother is typically present at the house when Children are in Father's custody. Children have a good relationship with Stepbrother. They play together often and get along well. Children also have a loving relationship with Stepmother. They enjoy doing activities together such as shopping, cooking and doing Children's hair. Children also have a good relationship with Father's extended family, specifically Father's father, brother, aunt and uncle. Children see Father's extended family approximately once every couple of months.

Father and Mother separated in January of 2023. Father recounted one incident during the time of their divorce when an argument got heated and

Mother pushed Father at the doorstep. After they separated, Mother and Father voluntarily agreed to the custody schedule they currently have in place, wherein Children primarily live with Mother but stay with Father every other weekend and spend Tuesday and Thursday evenings with him. Father also initially had overnights with Children every Friday, but Father stopped taking Children on Fridays after November of 2023. Father explained that this was because he was having a hard time financially and emotionally after the divorce. Father agreed to their current custody arrangement due to his work schedule, which required him to be at work very early in the morning. At the time, Father did not have anyone to assist him in getting Children ready to take them to Mother's parents' house in time for school. Since he has remarried, Stepmother is willing and able to get Children ready and take them to Mother's parents' house on school days.

Father testified that he has a loving relationship with A.G.P. Nevertheless, he believes his relationship with A.G.P. has suffered since his separation from Mother because they have less time to spend together. Father testified that his time with A.G.P. on Tuesday and Thursday evenings feels rushed because he has to watch the clock to return Children to Mother's house on time. Father believes that his relationship with A.G.P. would improve if he had more overnight custodial time with her. A.G.P. initially struggled with anxiety following the divorce and she began seeing a therapist. She is currently doing well. A.G.P. is also doing well in school and maintaining good grades.

Father testified that his relationship with A.P.P. has improved since the separation. Father acknowledged that he had a difficult time bonding with A.P.P. because he learned about Mother's infidelity shortly after A.P.P. was born. Father said he associated Mother's infidelity with A.P.P. and had a difficult time connecting with A.P.P.[1] After Mother and Father separated, there were multiple instances where Father only took A.G.P. and not A.P.P. during his custodial periods. After the divorce, Father began seeing a therapist and worked on his relationship with A.P.P. Their relationship has since greatly improved, and Father currently has a loving relationship with A.P.P. Father believes that his relationship with A.P.P. would also be strengthened if he had more overnight custodial time with her.

If the custody schedule is modified as Father wishes, Father stated that he will maintain the routine of dropping Children off at Mother's parents' house on school days. He has no concerns with Children being in Mother's parents' care. Father further stated that Mother is a good mother to Children and he has no concerns about Mother's boyfriend. Father does not think Mother has attempted to turn Children against him. He recounted one incident where Mother and Father disagreed on whether A.G.P. should get a cell phone and Mother told A.G.P. that Father did not want her to have the phone, causing A.G.P. to be upset with Father. Father stated that other than the instant

---

[1] Father clarified that he was never concerned that A.P.P. was not biologically his child but it was the knowledge that Mother had an affair while she was pregnant with A.P.P. which led to his emotional disconnect with A.P.P.

conflict over the custody schedule, there is not a high degree of conflict between him and Mother, and they generally cooperate with one another. Father further stated that he and Mother both adequately provide for Children's needs. Father acknowledged that Mother takes Children to most of their doctors' appointments because she schedules them and Father is unable to go to appointments before 4:00 p.m. due to his work schedule. Nevertheless, Father has attended emergency appointments and appointments scheduled in the evenings.

Based on the change in his circumstances after he remarried and his desire to maintain and improve his relationship with Children, Father filed the custody complaint seeking additional overnights with Children. Father denied that his motivation for filing the custody complaint was to decrease his child support obligation. Father stated that he declined Mother's offer to accept a lower child support amount if Father agreed to a custody schedule with only one additional overnight with Children. On cross-examination, Father acknowledged that he filed his custody complaint 10 days after a child support order was filed on July 2, 2024. Father further acknowledged that the child support order required Father to pay nearly double what he voluntarily paid previously.

Mother testified that during her marriage to Father, Father was the primary wage earner, and Mother was the primary caregiver for Children. She stated that approximately one year before their separation, Father had "checked out" and failed to fully participate in parenting Children. (N.T.

Custody Trial, 12/6/24, at 120). After he came home from work, Father would play video games and did not participate much in home activities with Children. Mother testified that after A.P.P. was born, Father did not contribute at all to her care. Father told Mother that he was doing so to punish Mother for her infidelity. Mother stated that Father favored A.G.P. over A.P.P. and told Mother that he did not bond with A.P.P.

Mother testified that she did not feel that Father respected her during their marriage. Mother recounted two heated arguments where Father became extremely angry and punched a hole in their bedroom wall and dented their bathroom door. Shortly after they separated, Father told Mother that he was unable to take care of both girls on his own. He stated that caring for A.P.P. was too much for him at the time and Father sometimes did not take A.P.P. during his custodial periods. Father and Mother agreed to a custody schedule in which Father would have custody of Children Tuesday and Thursday evenings, overnight custody every Friday and overnight custody every other weekend. At some point, Father stopped taking Children for overnights on Fridays. Mother was unsure why Father did so.

From January of 2023 until June of 2023, Mother fully financially supported Children. Thereafter, the parties agreed that Father would give Mother $600.00 per month for Children's care. Both parties complied with this agreement for approximately a year. When expenses began to increase for Children, Mother asked Father whether he would pay half of A.P.P.'s preschool tuition. Father declined. Shortly thereafter, Mother filed for child

support for Children in August of 2024. Mother stated that prior to her filing for child support, Father had never requested equal custodial time with Children. Mother stated that the first time she learned Father wanted equal custodial time was when she was served with the instant custody complaint. This occurred a few weeks after the child support order was issued.

Mother believes that consistency is very important for Children, especially A.G.P. A.G.P. struggled with anxiety after the parties' divorce and saw a therapist for a period of time. A.G.P. is currently doing much better with her anxiety and is doing very well in school. Mother believes that maintaining consistency in spending nights at Mother's house, particularly during the school year, is important for A.G.P. Mother stated that the current schedule is working well, and she does not believe that a drastic change in the schedule would be beneficial to A.G.P. considering her history of struggling to cope with change.

Mother works from home and has established a consistent routine for Children during the school week. Mother gets Children ready and takes Children to her parents' house at 7:30 a.m. A.G.P. takes the school bus from Mother's parents' house and returns there. Mother's mother, Barbera Hoover ("Maternal Grandmother"), takes A.P.P. to preschool and watches her for the remainder of the time. After Mother finishes work at 5:00 p.m., she goes to her parents' house. They often have dinner together at Mother's parents' house. After Mother and Children return to Mother's house, they have a consistent nighttime routine. Children typically go to bed between 8:30 p.m.

and 9:00 p.m.

At the conclusion of the evidence,[2] the court stated that it would take the matter under advisement. On December 19, 2024, the court issued a custody order which granted the parties shared legal custody of Children. The order further stated that during the school year, Mother would have primary physical custody of Children and Father would have partial physical custody on alternating weekends, starting from Thursday after school until Monday morning. During the summers, the court granted the parties equal shared physical custody of Children. Father timely appealed.

On July 21, 2025, this Court vacated the custody order, concluding that the trial court had not sufficiently stated its consideration of the custody factors on the record. This Court remanded the matter with instructions that the court place its evaluation of the custody factors on the record and enter a new custody order based on its assessment. *See Potts v. Potts*, No. 102 MDA 2025 (Pa.Super. filed July 21, 2025) (unpublished memorandum). On September 9, 2025, the trial court issued a new custody order, reimposing the same custody schedule as its previous custody order, and an opinion explaining its decision. On October 6, 2025, Father filed a timely notice of appeal and a contemporaneous concise statement of errors complained of on

---

[2] Stepmother, Stepmother's work supervisor, Mr. McClintock, and Maternal Grandmother also testified at the hearing. Stepmother and her supervisor largely corroborated Father's testimony. Mr. McClintock and Maternal Grandmother largely corroborated Mother's testimony.

appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).[3]

Father raises the following issue for our review:

Whether the [trial court] committed an error of law and/or abused its discretion when it rejected the existing schedule advocated by Mother and did not choose Father's proposed 2-2-3 schedule, and instead concluded that the physical custody schedule should be 10 days for Mother followed by 4 days for Father during the school year, where:

a) the direct/principal reason given in the post-appeal filed opinions as to why that decision was in the best interests of [Children] (not wanting the kids to bounce around during the school week) was contrary to and not supported by competent evidence in the record;

b) the [trial court's] legal conclusion as to the appropriate physical custody schedule was unreasonable since its factual findings did not support its conclusion that it was in [Children's] best interests to have the 10-4 schedule, as the record showed that [Children] had been thriving and doing "great" under a schedule which provided [Children] with regular and substantial/meaningful in person physical contact/interaction with both parents (with them going back and forth between their parents' houses during the weekdays);

c) the [trial court] stated in its post-appeal filed opinions that it was giving less weight/consideration to [Children's] relationship with their stepbrother, than it would [have] had

_____

[3] In its 1925(a) opinion, the trial court asserts that Father's issues on appeal should be waived because Father's concise statement is too lengthy and verbose. We agree that Father's 4-page statement is rather lengthy and consists of multiple subsections of explanation for the main issues Father raises. Nevertheless, we decline to find waiver on this basis because Father's concise statement is not so lengthy or incoherent that it impeded the trial court's ability to identify and address Father's issues on appeal. **See Astorino v. New Jersey Transit Corp.**, 912 A.2d 308, 309 (Pa.Super. 2006), *appeal denied*, 593 Pa. 737, 929 A.2d 1160 (2007) (declining to find waiver where concise statement was lengthy but provided context for issues appellant wished to raise).

he been a full blood or half-blood sibling, based on speculation that Father could get divorced at some point in the future, even though there was no evidence in the record to support that speculation, and even though the [trial court] stated at trial its finding that the girls' relationship with their stepbrother is a "good positive and healthy one"; and,

d) Father's proposed shared 2-2-3 custody schedule is in the best interests of [Children] based on the evidence of record and consideration of the custody factors set forth in 23 Pa.C.S.A. Section 5328(a), as this schedule provides each parent with regular and substantial/meaningful in person physical contact/interaction with [Children] on 7 days of every period of 14 days, custody exchanges occur every two days (instead of every day) during the week, and [Children] are only away from either parent for a maximum of 3 days on the alternating weekends.

(Father's Brief at 4-5).[4]

Father argues that the court's custody order is contrary to the best interests of Children. Father asserts that Mother and Father testified that A.G.P. was doing better with her anxiety and doing well in school under the previous custody schedule in which Father had Tuesday and Thursday evenings with Children. Father claims that A.G.P. also stated that she wanted to maintain that custody schedule. Based on this testimony, Father claims that the court's reasoning that it was not in Children's best interests to travel back and forth between Father's and Mother's houses during the school week is unreasonable and unsupported by the record. Father contends that the court failed to properly consider Father's improved relationship with A.P.P. and

_____

[4] We omit the issue in Father's statement of questions presented which addresses the court's claim that Father waived his issues on appeal by filing a defective concise statement. *See* footnote 3, *supra*.

- 11 -

the change in Father's circumstances which allow him to provide additional care for Children with the help of a supportive spouse. Father asserts that the court failed to properly weigh the relationship Children have with Stepbrother because the court erroneously determined that stepsibling relationships should be given less weight than blood sibling relationships. Father concludes that the court's imposition of a custody schedule in which Father would not see Children for 10 days in a 14-day window constituted an abuse of discretion, and this Court should vacate the custody order. We disagree.

The following principles apply to our review of a custody order:

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*E.C.S. v. M.C.S.*, 256 A.3d 449, 457-58 (Pa.Super. 2021) (quoting *S.T. v. R.W.*, 192 A.3d 1155, 1160 (Pa.Super. 2018)).

> [I]t is not this Court's function to determine whether the trial court reached the 'right' decision; rather, we must consider whether, 'based on the evidence presented, given due deference to the trial court's weight and credibility determinations,' the trial court erred or abused its discretion in awarding custody to the prevailing party.

- 12 -

***E.B. v. D.B.***, 209 A.3d 451, 468 (Pa.Super. 2019) (quoting ***King v. King***, 889

A.2d 630, 632 (Pa.Super. 2005)).

> With any child custody case, the paramount concern is the best interests of the child. This standard requires a case-by-case assessment of all the factors that may legitimately affect the physical, intellectual, moral and spiritual well-being of the child.

***M.J.M. v. M.L.G.***, 63 A.3d 331, 334 (Pa.Super. 2013), *appeal denied*, 620 Pa.

710, 68 A.3d 909 (2013) (quoting ***J.R.M. v. J.E.A.***, 33 A.3d 647, 650

(Pa.Super. 2011)).

The Child Custody Act provides:

> **§ 5328. Factors to consider when awarding custody**
>
> **(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving substantial weighted consideration to the factors specified under paragraphs (1), (2), (2.1) and (2.2) which affect the safety of the child, including the following:
>
> (1) Which party is more likely to ensure the safety of the child.
>
> (2) The present and past abuse committed by a party or member of the party's household, which may include past or current protection from abuse or sexual violence protection orders where there has been a finding of abuse.
>
> (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).
>
> (2.2) Violent or assaultive behavior committed by a party.

(2.3)     Which party is more likely to encourage and permit frequent and continuing contact between the child and another party if contact is consistent with the safety needs of the child.

(3)     The parental duties performed by each party on behalf of the child.

(4)     The need for stability and continuity in the child's education, family life and community life, except if changes are necessary to protect the safety of the child or a party.

(5)     The availability of extended family.

(6)     The child's sibling relationships.

(7)     The well-reasoned preference of the child, based on the child's developmental stage, maturity and judgment.

(8)     The attempts of a party to turn the child against the other party, except in cases of abuse where reasonable safety measures are necessary to protect the safety of the child.  A party's reasonable concerns for the safety of the child and the party's reasonable efforts to protect the child shall not be considered attempts to turn the child against the other party.  A child's deficient or negative relationship with a party shall not be presumed to be caused by the other party.

(9)     Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10)     Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11)     The proximity of the residences of the parties.

(12)     Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child or self from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a) (effective August 13, 2024 to August 28, 2025).[5]

Notably:

The parties cannot dictate the amount of weight the trial court places on the evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

*R.M.G., Jr. v. F.M.G.*, 986 A.2d 1234, 1237 (Pa.Super. 2009) (quoting *S.M. v. J.M.*, 811 A.2d 621, 623 (Pa.Super. 2002)).

Instantly, the trial court evaluated the custody factors as follows: 1) does not favor either party as there was no evidence that there were safety concerns for Children in the care of either parent; 2) not applicable pursuant to the stipulation of the parties; 2.1) not applicable pursuant to the stipulation

_____

[5] More recent legislation has reduced the number of custody factors. We cite to the custody factors that were in effect on December 19, 2024, when the court entered its initial custody order.

of the parties; 2.2) does not favor either party as Mother and Father both credibly testified to minor violent outbursts from the other party during heated arguments; 2.3) does not favor either party as the evidence largely suggests that both parties encourage Children's relationship with the other; 3) favors Mother because Mother was Children's primary caregiver during the parties' marriage, Father relinquished significant periods of custodial time with Children following the parties' separation, and Father did not participate at all in A.P.P.'s care for a period of time due to issues in the parties' marriage; 4) does not favor either party as both parties are able to foster stability and continuity in Children's lives; 5) does not favor either party as both parties testified that they have extended family with whom Children have a good relationship; 6) does not favor either party because the court declines to afford special weight to Children's relationship with Stepbrother; 7) favors Mother as A.G.P. stated that she was happy with the parties' established custody schedule; 8) favors neither party as neither party presented significant evidence of actions taken by the other party to turn Children against the other parent; 9) favors Mother because Mother credibly testified that Father favored A.G.P., failed to participate in A.P.P.'s care, and declined to take A.P.P. during his custodial times following their separation; 10) favors Mother because Mother credibly testified that Father often took a backseat to parenting during their marriage and after their separation; 11) does not favor either party as the parties stipulated that they live approximately 22 minutes away from one

another; 12) favors Mother as both parties rely on Mother's extended family to provide childcare for Children when the parties are working; 13) does not favor either party as both parties credibly testified to minor incidents of conflict between the parties; 14) not applicable as stipulated by the parties; 15) does not favor either party as neither party's mental or physical condition bears on the best interests of Children; and 16) favors Mother because the court credited Mother's testimony that Father initiated the instant custody proceeding in response to Mother filing for child support. (*See* Trial Court Opinion in Support of Final Order for Custody, filed 10/22/25, at 2-11).

More specifically with respect to factor six (the child's sibling relationships), the court explained:

> The court notes that it does look at full siblings, half-siblings and stepsiblings differently. The difference for the reasoning is that blood relatives will always be siblings, whereas, if Father, for some reason, separated from his wife, it is not as likely that those children would maintain contact long term. Therefore, the court disagrees with Father's assertion that the court must accord some special weight to the existence of and/or relationship with a stepsibling.

(*Id.* at 6-7). As to this particular finding, we agree with Father that the court erred in viewing stepsiblings differently than blood relatives when analyzing this custody factor. *See* 23 Pa.C.S.A. § 5328(a)(6), cmt. (stating: "Subsection (a)(6) is intended to include full-blood siblings, half-blood siblings, step-siblings and adoptive siblings"). Further, we emphasize that in this case there is undisputed testimony that Father and Stepmother have a

strong relationship and Children have a good relationship with Stepbrother.

Nevertheless, we cannot say that the court erred in concluding that Children's relationship with Stepbrother should not be weighed heavily in its custody determination. Specifically, the court noted that although Children currently have a good relationship with Stepbrother, their relationship is not a longstanding stepsibling relationship. Additionally, Children have only been sharing the same residence with Stepbrother since Father and Stepmother married in April of 2024. On this record, we cannot say the court abused its discretion in finding that Children's relationship with Stepbrother did not weigh heavily in favor of Father. **See Hare v. Hare**, No. 738 MDA 2024 (Pa.Super. filed Nov. 25, 2024) (unpublished memorandum) (concluding that there was no abuse of discretion in court's consideration of sibling custody factor where court erroneously stated that this factor applied only to siblings and not stepsiblings but court ultimately considered child's relationship with stepsiblings and found that relationship was not strong factor in custody determination).[6]

As well, Father claims that the court failed to consider the strong relationship that he currently has with A.P.P. Contrary to Father's claim, the court credited and considered Father's testimony that he saw a therapist and worked on his relationship with A.P.P. The court further acknowledged that Father now has a much stronger father-daughter relationship with A.P.P. (**See**

---

[6] **See** Pa.R.A.P. 126(b) (stating we may rely on unpublished decisions of this Court filed after May 1, 2019 for persuasive value).

Trial Court Opinion in Support of Final Order for Custody at 8). Nevertheless, in evaluating which parent undertook more parental duties and is likely to maintain a consistent and nurturing relationship with Children, the court found it significant that Father did not initially bond with A.P.P. due to the parties' marital problems and as a result, failed to participate in her care for a period of time. We decline to reassess the weight the court placed on this factor. **See R.M.G., Jr., supra**.

Additionally, we do not agree with Father that the record failed to support the court's determination that Children's best interests are served by staying in one household for the school week. Both parties testified that A.G.P. was doing well in school under their previously established custody schedule in which Children spend weeknights at Mother's house. Both parties testified that A.G.P. struggled with anxiety after the parties separated. Mother further testified that she worried about how A.G.P. would handle any drastic changes in the custody schedule. Further, A.G.P. expressed a preference to maintain the schedule where she spent overnights during the school week at Mother's residence. Additionally, the court found that Mother had performed more parental duties for Children, Father had previously relinquished overnight custodial time with Children due to his work schedule, and Father only requested additional overnight custodial time with Children after Mother filed for child support. Although Father disputed that his motivation for seeking more custodial time was based on the recent child support order, we defer to the court's credibility determinations. **See E.C.S., supra**; **E.B.,**

*supra*. As such, we cannot say that the court's decision in granting Mother primary physical custody of Children, particularly overnights during the school week, was unsupported by the record. ***See E.C.S., supra***.

Father also complains that the court removed his custodial periods on Tuesday and Thursday evenings, resulting in a longer gap of time between Father's custodial time with Children. However, Father testified that these custodial periods with Children always felt rushed and his relationship with Children would benefit from extended custodial periods with Children. The court crafted a custody schedule which minimized disruption to the existing schedule Children have become accustomed to while also allowing for Father to have additional overnight custodial time with Children. Although the court's custody schedule creates a longer gap between Father's custodial periods, it allows Father to have extended, undisturbed custodial time with Children from Thursday after school until Monday morning every other week. Accordingly, we discern no abuse of discretion in the court's custody determination, and we affirm the custody order. ***See E.C.S., supra***; ***R.M.G., Jr., supra***.

Order affirmed.

Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary

Date: 03/13/2026